## CORONA COAL CO. v. UNITED STATES.

District Court, N. D. Alabama. August 22, 1927.

No. 3925.

1. Internal revenue ⬅️7(17), 9(27)—Coal held article contributing to prosecution of the war (Revenue Act 1918, § 234a (8), being Comp. St. § 6336⅛pp).

Coal was an article contributing to the prosecution of the war within Revenue Act 1918, § 234a (8), being Comp. St. § 6336⅛pp, providing for allowance of a deduction for amortization of the cost of facilities for production of such articles.

2. Internal revenue ⬅️7(17), 9(27)—Opening and development work necessary for operation of a coal mine held "constructions" and "facilities" for production of an article contributing to prosecution of the war (Revenue Act 1918, § 234a [8], being Comp. St. § 6336⅛pp).

Mine openings and development work necessary for operation of a coal mine and consisting of excavation, shoring, and timbering are "constructions" and "facilities" for production of coal, within Revenue Act 1918, § 234a (8), being Comp. St. § 6336⅛pp, and a coal company making them is entitled to allowance of a deduction for amortization of their cost from income and profits taxes.

3. Statutes ⬅️193, 194—Doctrine of ejusdem generis and maxim noscitur a sociis are mere guides to legislative intent.

The doctrine of ejusdem generis and the maxim noscitur a sociis are not fixed rules of statutory construction but no more than guides to legislative intent.

4. Statutes ⬅️194—Full and general import should be accorded general expression, where particular words exhaust class.

Where the particular words used in a statute exhaust the class, full and general import should be accorded the general expression.

5. Internal revenue ⬅️7(17), 9(27)—Tax statute must be liberally construed in favor of taxpayer and to carry out legislative intent (Revenue Act 1918, § 234a (8), being Comp. St. § 6336⅛pp).

The purpose of Revenue Act 1918, § 234a (8), being Comp. St. § 6336⅛pp, was to afford relief to taxpayers who should expend capital to increase production of articles contributing to prosecution of the war, and no artificial rule should be invoked to defeat that purpose, but the statute should be liberally construed in favor of the taxpayer.

At Law. Action by the Corona Coal Company against the United States. Judgment for plaintiff.

William B. White, of Birmingham, Ala. (Bradley, Baldwin, All & White, of Birmingham, Ala., on the brief), for plaintiff.

Clark T. Brown, Sp. Atty., Bureau of Internal Revenue, of Washington, D. C., and Joseph Franklin, Asst. U. S. Atty., of Birmingham, Ala. (A. W. Gregg, Gen. Counsel, Bureau of Internal Revenue, of Washington, D. C., and C. B. Kennamer, U. S. Atty., of Birmingham, Ala., on the brief), for the United States.

GRUBB, District Judge. This suit is presented to the District Court sitting with jurisdiction concurrent with the Court of Claims under the provisions of paragraph 20 of section 24 of the Judicial Code (28 USCA § 41 [Comp. St. § 991]). Plaintiff seeks to recover income and profits taxes paid by it to the United States for the calendar year 1918. Payment was made by the plaintiff of certain amounts on account of such taxes for 1918, claim for a refund of a portion thereof duly filed with the United States Commissioner of Internal Revenue and disallowed to the extent of the principal amount of the judgment entered herein. The case was presented upon an agreed statement of facts stipulated by counsel for both parties, from which it appears, among other things, as follows:

The plaintiff was, during the years 1917 and 1918, engaged in the business of mining and selling coal in the state of Alabama. The coal produced by it was sold to factories, railroads, and steamships. After April 6, 1917, and prior to December 31, 1918, the plaintiff developed two additional coal mines, and, in order to construct the mines, it was necessary that plaintiff make openings in the surface of the earth to reach the coal and construct an area through which the coal might thereafter be removed. For the operation of the mines, such openings, when made, had to be kept clear, and, in order to accomplish this, it was necessary to install supports for the roof and sides of the openings. These supports consisted of props and various sizes of timber, and were essential for the mining and production of coal by the plaintiff. Without these openings as so constructed, coal could not be mined and produced, and their construction and continuous maintenance was necessary to the plaintiff's business.

After April 6, 1917, and prior to December 31, 1918, the plaintiff expended $64,617.09 in constructing and installing such openings for its mines then designated as Nos. 11 and 13. Such openings are commonly

known in the mining business as mine opening and development work, and on account of the plaintiff's expenditures in this connection it claims that a deduction should have been allowed to it by the Commissioner of Internal Revenue in computing its net taxable income for the calendar year 1918 under the provisions of section 234, subd. (a) (8) of the Revenue Act of 1918 (Comp. St. § 6336⅛pp). The percentage of this expenditure properly deductible under these provisions of the act has been stipulated by the parties, as have other minor adjustments to be made in determining the correct amount of the tax.

[1] The only two points at issue are as follows: First, Was coal an article contributing to the prosecution of the war? and, second, Are the costs of mine openings and development work within the purview and intent of section 234, subd. (a) (8), of the act? This provision of the act reads as follows:

"In the case of buildings, machinery, equipment, or other facilities, constructed, erected, installed, or acquired, on or after April 6, 1917, for the production of articles contributing to the prosecution of the present war, and in the case of vessels constructed or acquired on or after such date for the transportation of articles or men contributing to the prosecution of the present war, there shall be allowed a reasonable deduction for the amortization of such part of the cost of such facilities or vessels as has been borne by the taxpayer, but not again including any amount otherwise allowed under this title or previous acts of Congress as a deduction in computing net income."

That coal was an article contributing to the prosecution of war is clear. The same is true of practically everything produced in the mining industry. Indeed this has been recognized by the United States Treasury Department (see C. B. II—2, 146, C. B. IV—1, 159) and by the United States Board of Tax Appeals (see Appeal of Roden Coal Co. v. Commissioner of Internal Revenue, 5 B. T. A. 654). The United States, recognizing the necessity of coal in the prosecution of war, set up an elaborate system for the control of its production and distribution by the creation of the United States Fuel Administration. Coal as well as most minerals clearly comes within the definition of the word "article," and the mining of coal as clearly comes within the meaning of the word "production" as used in the statute.

Counsel for the United States urge that, because the coal produced may not have been used by the government itself, but for the operation of factories, railroads, and steamships, it should not be regarded as an article contributing to the prosecution of war. This position is at variance with the published pronouncements of the Solicitor of Internal Revenue. C. B. IV—1, 159. The point is fully discussed by the United States Board of Tax Appeals in the appeal of Roden Coal Company, supra, and it is clear that in this statute Congress did not intend that its application should be limited only to taxpayers furnishing articles directly to the United States, but intended that it should be applied to taxpayers furnishing articles contributing to the prosecution of war, either to the United States or to others.

[2] A shaft or slope is, from the nature of things, an essential in the mining and production of minerals. Shafts and slopes are usually constructed by removing the overburden between the surface and mineral, and supporting the opening so made with steel, timber, or concrete work. Of course the construction of a shaft or slope involves proper work on the surface in preparation therefor and for the use thereof after construction is completed. The opening is an artificial and an absolutely essential method of rendering the mineral available. The shores and supports are equally essential to make and keep the opening available for the production of the mineral. Together they constitute an essential facility in the industry. Counsel for the United States urge that the cost of such mine openings and development work is not within the meaning of the statute, because they say such items are not "buildings, machinery, equipment, or other facilities" within the meaning of the statute, and were not "constructed, erected, installed, or acquired" within the meaning of the statute. In support of this position they urge the application of the doctrine of ejusdem generis to the construction of the congressional intent. It is clear that mine openings, shafts, and slopes, with their necessary shores and supports, are constructed and installed within the ordinary meaning of those words. The statute is clearly intended to be remedial in its operation, a relief provision, and any technical limitation of the words used would defeat the true congressional intent. A reading of the statute is convincing that Congress had no intention of discriminating in its application between the mining industry and other industries. The mere fact that a substantial portion of the facilities of the mining industry are underground and of other industries are above the ground is certainly not a sufficient reason for denying to

the mining industry the relief intended by the statute. Excavation for and preparing the foundation of a building is as much a part of its construction as actually placing the structure on the foundation so prepared. Excavation for a mine slope or shaft, and the installation therein of shores and supports, is equally construction and installation. Without the foundation, there would be no building. Without the shaft or slope, there would be no mine.

[3] Nor am I impressed with the effort of the United States to place a technical limitation on the operation of the statute by the application of the doctrine of ejusdem generis. In the appeal of Manville Jenckes Co., 4 B. T. A. 765, the United States Board of Tax Appeals says:

"This provision of the statute is a relief provision, and, under the well-known rules of statutory construction, if there is any doubt concerning its meaning, it must be liberally construed in favor of the taxpayer. Language may not be added or an interpretation made which deprives the taxpayers of rights which the wording of the section construed in its ordinary meaning grants."

The doctrine of ejusdem generis and the maxim noscitur a sociis are not fixed rules of statutory construction. They are nothing more than guides in seeking the true legislative intent. See Danciger v. Cooley, 248 U. S. 319, 39 S. Ct. 119, 63 L. Ed. 266; Mason v. U. S., 260 U. S. 545, 43 S. Ct. 200, 67 L. Ed. 396; U. S. v. First Nat. Bank (D. C.) 190 F. 336.

In the Mason Case, supra, the court says of the doctrine of ejusdem generis:

"It cannot be employed to render general words meaningless, since that would be to disregard the primary rules, that effect should be given to every part of a statute, if legitimately possible, and that the words of a statute or other document are to be taken according to their natural meaning."

[4] Furthermore, these rules are subject to an exception which is of importance in arriving at the congressional intent in this enactment. Where the particular words used exhaust the class, full and general import should be accorded the general expression. See U. S. v. Mescall, 215 U. S. 26, 30 S. Ct. 19, 54 L. Ed. 77; In re Rheinstrom & Sons Co. (D. C.) 207 F. 119; National Bank of Commerce v. Ripley, 161 Mo. 126, 61 S. W. 587. It is difficult to conceive of anything similar to "buildings, machinery, and equipment" which is not comprehended within the generally accepted definitions of those words. This being the case, "other facilities" must

be given full meaning. A mine is certainly a "facility," a word variously and broadly defined by the courts. "Convenient means" is perhaps a complete definition of "facility." Coal, iron ore, and other minerals lie dormant in the ground until the convenient means for their production is furnished by the construction of a mine, including the shaft or slope necessary to reach the mineral, as well as the railroad tracks, mine machinery, tipples, and other equipment which together make a complete mine. It is common knowledge that a mine is a great deal more than a mere hole in the ground, and that its construction and installation is a great deal more than a mere change in the existing form of real estate. Its entries, slopes, or shafts must be protected from cave-in by the construction of elaborate shores, props, and supports. It must be equipped with rails, machinery, equipment for haulage and extraction of the minerals, pumps for dewatering, machinery for proper ventilation, and machinery and equipment for the production and preparation of the mineral for use in the market. All these things together, not merely a part of them, constitute the "facility," the "convenient means," for the production of minerals.

The manifest purpose of the act was to afford relief to taxpayers who increased production of articles contributing to the prosecution of war. The means adopted by the act were to permit a deduction measured by proper amortization of the cost to the taxpayer of appropriate facilities. There is no limitation of "articles" to a kind or class. Neither is there a limitation of "facilities." The facilities, then, may differ as widely as the articles. If the production be from underground, then appropriate underground facilities are provided for as fully as appropriate facilities for production above ground are provided for. Above ground is open, and an appropriate provision for production may be to inclose. Underground is closed, and an appropriate provision for production may be to open. The purpose of each provision is the same, and the necessity even is the same. The difference is only in the means resulting from difference in place and condition.

"Facilities" is a broad general term. No reason is suggested or can be conceived for an interpretation which would embrace an appropriate structure above ground and exclude an appropriate structure underground. To the contrary, any such interpretation might defeat the purpose of the act, tending as it would to favor facilities for production

above ground and discriminate against facilities for production underground. The former might have been rendered useless without the latter. Certainly coal was a prime war necessity which could not be produced without opening the earth. It must be noted too that the opening involved not a hole merely but a structure, since it was and had to be propped and shored and thereby became space inclosed by roof, walls, and floor. It was then in purpose and provision a building underground, but I am not impressed that there need be any such analogy to a building above ground in order to constitute a facility. If it was not a facility, what was it? Certainly it was a necessity. Wherein did it differ from the tipple over which coal is dumped, or the ovens in which coal is coked, when we consider the purpose of the act, the means adopted by Congress for accomplishing the purpose, and the essential nature of the appropriate provision here involved for producing an article useful in the prosecution of war?

[5] There can be no question that Congress by this enactment intended to afford relief to those taxpayers who, facing excessive war costs, proceeded to contribute to the prosecution of the war by providing increased production through new and substantial capital expenditures. It is equally clear that Congress had no intention in affording this relief to discriminate against the mining industry, one of the most important of the industries contributing to the prosecution of the war. No artificial rule should be invoked to override the clear congressional intent. The act imposes taxes, and in doubtful cases is of course to be construed favorably to the taxpayer. The right to assess the tax must be clearly expressed in the words used. There seems to me no doubt of the congressional intent in this statute, and, were there any, the taxpayer would be entitled to have the doubt resolved in its favor.

Judgment has accordingly been entered for the plaintiff.