ARKANSAS-OKLAHOMA GAS COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 27711, 27712. Promulgated January 23, 1952.

*Harry P. Daily, Esq.,* for the petitioner.
*F. S. Gettle, Esq.,* for the respondent.

#### OPINION.

RICE, *Judge:* The Commissioner determined deficiencies in income tax for the years 1944 and 1945 in the amounts of $6,729.51 and $7,975.12, respectively.

The sole issue is whether petitioner is entitled to amortize intangible drilling and development costs of three gas wells under section 124 of the Code or whether such costs are recoverable as depletion under section 23 (m) of the Code. All of the facts were stipulated.

The stipulated facts are so found, and are incorporated herein.

Petitioner is a Delaware corporation authorized to do business in Arkansas and Oklahoma. It was incorporated on June 19, 1936, as the Southern United Gas Company. On December 31, 1943, its corporate name was changed to its present name, pursuant to a duly filed amendment of articles of incorporation. Its principal business office is in Fort Smith, Arkansas.

Petitioner is engaged in the production, transportation, distribution, and sale of natural gas in two counties in Oklahoma and in four adjoining counties in Arkansas.

Prior to August 31, 1943, its business was conducted through wholly-owned subsidiaries, one of which was Western Oklahoma Gas Company. A Necessity Certificate for the drilling of six natural gas wells in the Spiro Field in LeFlore County, Oklahoma, was issued to this subsidiary on May 28, 1941, under the provisions of section 124 of the Internal Revenue Code.[1] Appendix A of the Necessity Certificate gives a detailed list of the facilities covered by such certificate, a portion of which is as follows:

---

[1] SEC. 124. AMORTIZATION DEDUCTION.

(a) GENERAL RULE.—Every person, at his election, shall be entitled to a deduction with respect to the amortization of the adjusted basis (for determining gain) of any emergency facility (as defined in subsection (e)), based on a period of sixty months. Such amortization deduction shall be an amount, with respect to each month of such period within the taxable year, equal to the adjusted basis of the facility at the end of such month divided by the number of months (including the month for which the deduction is computed) remaining in the period. Such adjusted basis at the end of the month shall be computed without regard to the amortization deduction for such month. The amortization deduction above provided with respect to any month shall, except to the extent provided in subsection (g) of this section, be in lieu of the deduction with respect to such facility for such month provided by section 23 (l), relating to exhaustion, wear and tear, and obsolescence. The sixty-month period shall begin as to any emergency facility, at the election of the taxpayer, with the month following the month in which the facility was completed or acquired, or with the succeeding taxable year.

\* \* \* \* \* \* \*

(e) DEFINITIONS.—

(1) EMERGENCY FACILITY.—As used in this section, the term "emergency facility" means any facility, land, building, machinery, or equipment, or part thereof, the construction, reconstruction, erection, installation, or acquisition of which was completed after December 31, 1939, and with respect to which a certificate under subsection (f) has been made. \* \* \*

\* \* \* \* \* \* \*

(f) DETERMINATION OF ADJUSTED BASIS OF EMERGENCY FACILITY.—In determining, for the purposes of subsection (a) or subsection (h), the adjusted basis of an emergency facility—

(1) There shall be included only so much of the amount otherwise constituting such adjusted basis as is properly attributable to such construction, reconstruction, erection, installation, or acquisition after December 31, 1939, as either the Secretary of War or the Secretary of the Navy has certified as necessary in the interest of national defense during the emergency period. which certification shall be under such regulations as may be prescribed from time to time by the Secretary of War and the Secretary of the Navy, with the approval of the President.

\* \* \* \* \* \* \*

(g) DEPRECIATION DEDUCTION.—If the adjusted basis of the emergency facility computed without regard to subsection (f) of this section is in excess of the adjusted basis computed under such subsection, the deduction provided by section 23 (l) shall, despite the provisions of subsection (a) of this section, be allowed with respect to such emergency facility as if its adjusted basis were an amount equal to the amount of such excess.

## APPENDIX A

### Detailed List of the Facilities

Drilling of six natural gas wells in the Spiro Gas Field on mineral rights or leaseholds now owned, or to be acquired by the applicant, situated in LeFlore County, Oklahoma. Each well to be drilled an estimated depth of 5,400 feet, and equipped with 5,400 feet of 7″ and 300″ of 10″ pipe.

The following estimate of cost is made for the drilling, equipping and shutting in of the wells and the expense of obtaining mineral rights or gas leases. A complete and detailed account of the cost of the wells, when completed will be filed and made a part of this Appendix "A".

The production volume of the wells is estimated to be 1,000,000 cubic feet each, or a total of 6,000,000 cubic feet daily for the six wells.

GAS WELLS:

Each Well.

| | |
|---|---|
| 5,400 feet depth at $4.50 per foot | $24, 300. 00 |
| 5,400 feet of 7″ OD Casing | 7, 992. 00 |
| 300 feet of 10″ Casing | 600. 00 |
| Miscellaneous | 2, 000. 00 |
| Total per well | $34, 892. 00 |
| Total for 6 wells | $209, 352. 00 |

The remainder of the certificate covered the construction of a pipe line from said field to Fort Smith, Arkansas.

Petitioner filed a statement of the actual cost of the emergency facilities covered by the Necessity Certificate with the Civilian Production Administration which transmitted an amendment to the Necessity Certificate to the Commissioner of Internal Revenue. Appendix A of such amendment describes the same facilities as the original certificate, but gives the actual instead of the estimated costs as follows:

### Necessity Certificate WD–N–1819

### APPENDIX A

| | |
|---|---|
| 6 Gas Wells total cost | $214, 167. 14 |
| Transmission Pipeline total cost | 178, 041. 15 |
| Grand total | $392, 208. 29 |

The facilities covered by the Necessity Certificate were acquired and completed in the latter part of 1941. An election was made to take the amortization deduction on the facilities beginning the 60-month period of amortization on January 1, 1942. On August 31, 1943, as part of a nontaxable transfer under section 112 (b) of the Internal Revenue Code, all of the assets including the Necessity Certificate belonging to its subsidiary, the Western Oklahoma Gas Company, were transferred to petitioner, and the subsidiary was dissolved and its charter surrendered.

For 1944 and 1945 petitioner claims deductions for amortization of the intangible drilling and development costs on three of the six wells constructed under the Necessity Certificate. By its letter dated December 26, 1945, petitioner filed its election under section 124 (d) (4) to terminate the amortization period with respect to emergency facilities covered by its Necessity Certificate as of September 30, 1945, the last day of the month during which the President proclaimed the emergency period ended.

The Commissioner disallowed the deductions claimed for amortization of the intangible drilling and development costs and allowed some depletion in lieu thereof.

Subsection (a) of section 124 of the Code provides for amortization of any emergency facility as defined in subsection (c). Subsection (e) provides that the term "emergency facility" as used in the entire section includes, among other things, "land."

The petitioner argues that:

Where a Necessity Certificate has been issued under (f), then an emergency facility * * * is amortizable, whether it is depreciable or not, if included in such Necessity Certificate. But, when amortization is taken on such an item, depreciation can not also be claimed. This gives effect to all of the language used, and does violence to none.

Respondent, on the other hand, argues that section 124 was not intended to cover items which are subject to depletion under section 23 (m) of the Code.

Section 124 (f) (1) was amended by 55 Stat. 757 (1941) to provide that the certificate issued "shall be under such regulations as may be prescribed from time to time by the Secretary of War and the Secretary of the Navy with the approval of the President." The effective date of such amendment was retroactive to the initial effective date of section 124.

The first regulation so issued was approved by the President on May 22, 1942.[2] Paragraph 3 (c) of the regulation provided that, with the exception of land, facilities would not be certified in the future unless subject to deductions under section 23 (1) of the Code. It further provided that land would not be certified as necessary unless *directly* related to the production, storage, transportation, or protection of supplies required in the interest of national defense. Paragraph 8 of the same regulation provided that all Necessity Certificates issued prior to the effective date of the regulation were ratified and confirmed. In the instant case, a Necessity Certificate was issued on May 28, 1941. Petitioner argues that even though the regulation did not allow amortization of intangible drilling and development costs, amortization should be allowed in the instant case under para-

[2] Fed. Reg. 4233–4235, June 4, 1942.

graph 8 described above, since the Necessity Certificate was issued prior to the promulgation of such regulation.

Such a question has never been presented to this Court before, and we have been unable to find any authority on the issue except for the ruling by the Commissioner in I. T. 3610, 1943 C. B. 411. The question presented there was whether the cost of removal of waste land and of overburden to uncover an underground ore body, and the cost of drilling openings to develop the ore body, within land which was an "emergency facility" as defined in section 124 (e) of the Code, as amended, were subject to the amortization deduction provided in section 124 (a), as amended. After discussing the regulation issued under such section, the ruling went on to state:

The above-mentioned improvements to the land in the instant case are for the stated purpose of uncovering or otherwise developing an underground ore body. The cost of such improvements should be charged to capital account recoverable through depletion. (See section 19.23(m)-15 of Regulations 103.) A capital account properly recoverable through depletion is not subject to the optional amortization deduction under section 124 (a) of the Internal Revenue Code, as amended.

The opinion expressed herein is apparently shared by the certifying authorities inasmuch as assets or accounts subject to depletion are excluded from certificates of necessity. Certification is required since the term "emergency facility" means inter alia, any facility with respect to which a certificate under section 124 (f) of the Internal Revenue Code has been made. (See section 124 (e) and (f) of the Code, as amended, and sections 19.124–0 and 19.124–2 of Regulations 103.)

A study of the legislative history of section 124 indicates that such section was added to the Code in order to aid in the development of national defense. Industries which had to undergo large expansions in order to fulfill defense contracts were alarmed at the costs of such expansion programs. While such costs would be recoverable over the years by means of depreciation, they were dissatisfied with such treatment since they feared that at the end of the emergency period, when they would again return to peacetime activities, such enlarged facilities would be unnecessary or useless; and while they could still continue to write off depreciation each year, they might not have sufficient income against which to deduct it. The Second Revenue Act of 1940, therefore, added section 124 to the Code in order to speed up the rate of depreciation to coincide with the useful life of such facilities. The hearings before Congress, prior to the enactment of the Second Revenue Act of 1940, are replete with statements indicating that this was the purpose of such enactment; and such legislative history indicates that the purpose of such provision was to cover deductions normally covered under section 23 (1) of the Code.

Section 124 (a) itself provides, in part, as follows:

* * * The amortization deduction above provided with respect to any month shall, except to the extent provided in subsection (g) of this section,

be *in lieu of the deduction* with respect to such facility for such month *provided by section 23 (1)*, relating to exhaustion, wear and tear, and obsolescence. ✱ ✱ ✱ [Emphasis added.]

In the Joint Hearings before the Committee on Ways and Means, House of Representatives, and the Committee on Finance, United States Senate, 76th Congress, 3rd Session, on Excess Profits Taxation, Amortization, and Suspension of Vinson-Trammell Act, August 9, 10, 12, 13, and 14, 1940, the following appears: [3]

REPORT OF THE SUBCOMMITTEE ON INTERNAL REVENUE TAXATION OF THE COMMITTEE ON WAYS AND MEANS RELATIVE TO EXCESS-PROFITS TAXATION AND SPECIAL AMORTIZATION

✱     ✱     ✱     ✱     ✱     ✱     ✱

### II. Amortization of Emergency Facilities

The extension of existing facilities is a necessary and vital part of the national-defense program. To obtain the needed facilities will require the investment of hundreds of millions of dollars. Your subcommittee has been informed by the Advisory Commission to the Council of National Defense that substantial amounts of private capital will not be invested in the construction of such facilities unless corporations are assured, in view of the fact that such facilities will be of use chiefly only during the period of national emergency, that they will be permitted to amortize the cost thereof over a shorter period than would be permitted under the depreciation provisions of the Internal Revenue Code.

Your subcommittee, therefore, recommends that a corporation be allowed a deduction for income- and excess-profits tax purposes for the amortization of certain facilities which are certified by the Advisory Commission to the Council of National Defense and either the Secretary of War or the Secretary of the Navy as necessary in the interest of national defense during the present emergency. Such facilities are land, buildings, machinery, and equipment, or parts thereof, constructed, reconstructed, erected, installed or acquired after July 10, 1940, and the construction, reconstruction, erection, installation, or acquisition of which was contracted for prior to the termination of the present emergency. It is recommended that the write-off of the cost (adjusted basis for income-tax purposes) of such facilities be permitted to be spread over a period of 60 months, this deduction to be in lieu of the present deduction for exhaustion, wear and tear, and obsolescence provided for in section 23 (1) of the Internal Revenue Code. The taxpayer should have the option of beginning the 60-month period either with the month following the month in which the facility is completed or with the taxable year following the year in which the facility is completed, by signifying on the appropriate income-tax return its desire to have the benefits of the amortization deduction. [p. 3]

✱     ✱     ✱     ✱     ✱     ✱     ✱

It is noted that section 29.124–0 of Treasury Regulations 111 did not define intangible drilling and development costs as an emergency facility. In such regulation, only the following appears:

---

[3] For further statements of legislative intent, see also pp. 26, 75–78, 308, 339–344. See also Hearings before the Senate Committee on Finance on H. R. 10413, 76th Cong., 3rd Sess. (Sept. 3, 4, and 5, 1940), pp. 109, 123–128, 158–166, 169, 213, and 275; and H. R. 2894, 76th Cong., 3rd Sess., pp. 16, 38, 41.

Definitions.—

\*　　\*　　\*　　\*　　\*　　\*　　\*

(b) "Emergency facility" means any facility, land, building, machinery, or equipment, or any part thereof,—

\*　　\*　　\*　　\*　　\*　　\*　　\*

The term "emergency facility," as so defined, may include, among other things, improvements of land, such as the construction of airports and the dredging of channels.

Under section 23 (m) of the Internal Revenue Code, provision is made for depletion in the case of mines, oil and gas wells, other natural deposits, and timber to be made under regulations prescribed by the Commissioner with the approval of the Secretary. Section 29.23 (m)–16 of Treasury Regulations 111 gives the taxpayer an option to charge intangible drilling and development costs to capital or to expense. Such regulation provides that intangible drilling and development costs apply in general "only to expenditures for those drilling and development items which in themselves do not have a salvage value." Once an election is so made, it is binding for all subsequent years.

Petitioner, through its subsidiary, had elected to capitalize intangible drilling and development costs, and such election is binding. Following the enactment of section 124, no new regulations were issued under section 23 (m) permitting amortization of intangible drilling and development costs in those instances where a Necessity Certificate was obtained. If this were permitted, it would give a taxpayer a third option in addition to the options to capitalize or expense such costs. The purpose of adding section 124 to the Code was to allow a taxpayer to recover his capital at a faster rate than was ordinarily allowed under section 23 (l). Such a purpose is unnecessary where the taxpayer recovers his expenditures by means of depletion which is, in itself, based on the productivity of the natural resource. *Choate* v. *Commissioner*, 324 U. S. 1 (1945).

Under such circumstances, we feel that section 124 does not cover intangible drilling and development costs such as are here in question. This view is borne out by the legislative history of the section and the regulations promulgated thereunder. If Congress had intended to include such costs under such section, it would unquestionably have excluded deductions under section 23 (m) as well as under section 23 (l). The fact that the regulations approved by the President contained a provision ratifying and confirming all Necessity Certificates issued prior to the effective date of such regulations is not controlling in a situation such as this where the deduction claimed by the petitioner was never granted by the Code.

Petitioner relies on *Corona Coal Co.* v. *United States* (N. D. Ala. 1927), 21 F. 2d 489, affd. (C. A. 5, 1928) 23 F. 2d 673, as authority for

its view that intangible drilling and development costs can be amortized under section 124  In such case, it was held that the cost of opening two shafts in a coal mine was deductible in 1918 under section 234 (a) (8) of the Revenue Act of 1918, which provided for amortization of "buildings, machinery, equipment, or other facilities." It was held that the cost involved in the *Corona* case came within "other facilities." The *Corona* case was decided under the Revenue Act of 1918 while the instant case is under the Second Revenue Act of 1940 and the language of the two acts is sufficiently different to prevent the *Corona* case from being determinative of this case. We have already set forth our reasons why we feel that the Second Revenue Act of 1940 did not include depletable assets in the provision allowing amortization of emergency facilities.

We, therefore, hold that the respondent did not err in denying petitioner a deduction for intangible drilling and development costs under section 124 of the Code for the years 1944 and 1945.

Reviewed by the Court.

*Decision will be entered under Rule 50.*