NATIONAL LEAD COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 37694.   Filed March 14, 1955.

*Floyd F. Toomey, Esq.*, and *Karl Riemer, Esq.*, for the petitioner.
*Clay C. Holmes, Esq.*, and *James E. Markham, Jr., Esq.*, for the respondent.

OPINION.

MURDOCK, *Judge:* The Commissioner determined deficiencies as follows:

| Year | Income tax | Excess profits tax |
|------|-----------|--------------------|
| 1941 | $32, 196. 29 | ------------ |
| 1942 | ---------- | $1, 426. 59 |
| 1943 | ---------- | 2, 416, 728. 13 |
| 1944 | 91, 026. 81 | 1, 032, 315. 21 |

All facts stipulated by the parties are adopted as findings of fact.

### Metal Mine Issue.

The most important issue in the case is whether the petitioner is entitled to percentage depletion under section 114 (b) (4) of the Internal Revenue Code based upon 15 per cent of the gross income from ilmenite obtained from its MacIntyre Mine. The petitioner purchased the MacIntyre Mine at Tahawus, New York, in 1941. It is a massive outcropping of intimately intermixed ilmenite and magnetite on the side of a hill. The petitioner removes the overburden, mines the rock in an open mine by drilling and blasting, and hauls the broken

rock to its nearby mill where the rock is crushed and extensively processed to separate the ilmenite and the magnetite each of which is then shipped to other points. The magnetite was used almost entirely by purchasers in producing iron and steel. The Commissioner allowed percentage depletion based upon the production of magnetite at the MacIntyre Mine but disallowed depletion "in respect of your ilmenite ores" for the years 1942, 1943, and 1944.

Ilmenite is a compound containing large percentages of iron, titanium, and oxygen. It is a source of titanium pigments used in manufacturing paint and other products. The qualities making titanium dioxide and other titanium products valuable as pigments are due to the presence therein of titanium, a metal. The petitioner used most of the ilmenite mined at Tahawus during the taxable years by further refining it into titanium compounds for use as pigments in paints and some other products. It sold the remainder to other producers of titanium products. None of the ilmenite mined at Tahawus during the taxable years was reduced to titanium, unless perhaps on an experimental basis. Other metal ores are mined, refined, and used commercially without ever being reduced to metals, and yet the Commissioner's practice is to allow percentage depletion to those mines. The metal ores mined by the petitioner during the taxable years from its MacIntyre Mine were mined, processed, and refined to produce ilmenite in order to obtain the benefits and value of its titanium metal content. That mine is generally regarded as a metal mine. It was quite unlike a clay bank, a sand or gravel pit, or a rock quarry from each of which substances containing metals are removed and used in the state in which they occur in nature. It was like other mines mentioned by Congress when enacting the percentage depletion provisions and generally regarded as metal mines, in which ore is taken out of the ground, processed, and refined in order to obtain the benefits of its metal content.

The argument of the Commissioner is that there can be no metal mine for the purpose of the percentage depletion provisions of the Internal Revenue Code unless the material mined is reduced to metal before being used commercially, i. e., it is not a metal mine if its metallic ores are refined merely to a substance which is not a metal. The Commissioner's definition is too narrow for the purpose stated. No definition of a metal mine is given in the Code. The legislative history of the Code provisions and the regulations and rulings of the Treasury Department do not supply a definition and there appears to be none which is precise, readily available, or generally accepted. Marginal situations might cause authorities to disagree as to whether a given mine was or was not a metal mine. Some sensible and reasonable meaning must be given to the words to carry out the purpose of Con-

gress as it relates to this case. The following finding or conclusion is supported by a preponderance of the evidence and seems to carry out the intent of Congress:

The MacIntyre Mine was, during the taxable years, a metal mine, a titanium metal mine, within the meaning of the provisions of the Internal Revenue Code relating to percentage depletion. This will enable the parties to compute deductions for depletion.

### Mining Costs Issue.

The Commissioner contends that the MacIntyre Mine was in "the development stage" until July 15, 1942, and the expenditures for stripping the overburden and cutting benches prior to that date must be capitalized. Capitalizing them means that they will have no effect upon taxable income since the petitioner is entitled to use percentage depletion deductions in which capital costs play no part. A bench is a level area across the face of a hill usually cut at 35-foot-height intervals to provide a place for the mining machinery to stand and a surface to catch and over which to haul blasted ore and waste, the one to the mill, the other to a dump.

Paragraphs (8) and (9) of the stipulation on this point are as follows:

(8) The original mining plan prepared for the MacIntyre Mine orebody was an "open hillside" operation, involving simultaneous attack upon the rock orebody from six roughly parallel levels, known as benches. Before mining operations could be conducted from said benches, it was necessary for the petitioner to, and the petitioner did—

(a) clear the orebody and mill site of timber and underbush;

(b) conduct core drilling operations, to outline the orebody more precisely;

(c) construct an access road from the mill site to the mine face, and from the mine face to the waste dump area;

(d) strip the overburden from a portion of the orebody, and mine the ore so exposed in such manner as to leave the rock face in the form of the six benches desired.

(9) The amounts expended and incurred by the petitioner in conducting the operations described in the preceding paragraph were as follows:

*In 1941*

| | | |
|---|---|---|
| (a) Clearing site | | $12, 193. 05 |
| (b) Core drilling | | 26, 773. 40 |
| (c) Access roads | | 1, 579. 60 |
| (d) Stripping overburden and cutting benches | | 14, 216. 40 |
| Subtotal | | $54, 762. 45 |
| Plus overhead | | 4, 799. 04 |
| Total, 1941 | | $59, 561. 49 |

*In 1942*

| | | |
|---|---|---:|
| (a) | Clearing site | $5,105.27 |
| (b) | Core drilling | 246.87 |
| (c) | Access roads | 23,244.40 |
| (d) | Stripping overburden and cutting benches | 209,199.59 |
| | Subtotal | $237,796.13 |
| | Plus overhead | 5,384.70 |
| | Total, 1942 | $243,180.83 |
| | Total | $302,742.32 |

The petitioner concedes that the portion of the above expenditures attributable to (a), (b), and (c) benefited the entire orebody and should be capitalized instead of being deducted as expense, but it contends that the amounts shown as (d) for stripping the overburden and cutting the benches both in 1941 and 1942 are deductible as expenses of mining or as costs of production.

The mill was completed about July 15, 1942. The parties make no point of the fact that the record does not show what portion of items (d) represented cost of stripping the overburden and what portion represented cutting of benches, or what portion of (d) for 1942 was expended prior to July 15, 1942, the date on which the Commissioner concedes that the development stage ended. It is stipulated that the operations conducted and expenditures incurred as set forth in the quoted paragraph "gave the petitioner access to ore reserves estimated at 1,702,563 tons." The total estimated tonnage of the orebody was from 14 to 15 million tons. Fifty thousand tons of ore were mined in the course of cutting benches between May 1, 1942, and July 15, 1942. 294,563 tons were mined during 1942, 879,697 tons during 1943, and "after certain further development work, 1,002,226 tons during 1944." The ore mined in the course of cutting the benches consisted of waste and ore suitable for milling in substantially the same proportions as that subsequently mined.

The Commissioner's argument that the development stage of the mine continued to July 15, 1942, is based upon Regulations 111, section 29.23 (m)–15 (a), which provides as follows:

All expenditures in excess of net receipts from minerals sold shall be charged to capital account recoverable through depletion while the mine is in the development stage. The mine will be considered to have passed from a development to a producing status when the major portion of the mineral production is obtained from workings other than those opened for the purpose of development, or when the principal activity of the mine becomes the production of developed ore rather than the development of additional ores for mining.

The petitioner argues that this mine "never went through a development stage" and the expenditures in question were for normal mining operations and did not benefit the property as a whole.

The Commissioner contends that this regulation applies equally well to an underground mine and to an open mine, such as the MacIntyre Mine. It is easy to understand that a shaft dug from the surface of land down to a mineral deposit lying well below the surface, which shaft is to be used to gain access to the underlying ore and to bring the mined ore to the surface, is a capital expenditure made to develop the orebody. However, it is not readily apparent that any comparable expenditure is involved in the cost of stripping overburden and cutting benches involved herein, although the record does not leave this question free from doubt.[1] The plant manager at the MacIntyre operation, a mining engineer, testified that when he came to the property shortly after Christmas of 1941 one bench, opposite the mill, had been cut across; a series of benches had been established by the end of 1942 as the result of drilling, blasting, and removing ore and waste rock; more of the overburden had to be removed and more benches had to be cut in 1943 and in all subsequent years, and when the benches were established they were merely pushed back further into the hill to release more ore and rock; and the operations in 1943 and 1944 were not different from the operations in 1941 and 1942 which resulted from the expenditures under (d) of paragraphs (8) and (9) of the stipulation. The Commissioner recognizes the cost of removing overburden and the cost of cutting benches in subsequent years as deductible expenses. The operation of cutting the benches in 1941 and 1942 produced many tons of ore and waste in the same proportions and at costs not claimed by the Commissioner to exceed those which resulted from subsequent operations.

The evidence predominates slightly in favor of the petitioner's contention that none of that ore was from workings opened for the purpose of development but resulted from normal mining operations indistinguishable from the operations of later years, and the principal activity of the mine when the first bench was started was the production of ore rather than the development of additional ores for mining. The Commissioner's contention that (d) represented development costs must fail under the words of the regulation.

### Accelerated Amortization of Mine Development Costs.

The petitioner received a certificate of necessity dated March 8, 1943, certifying that the facilities described therein were necessary in the interest of national defense during the emergency period up to 100 per cent of the cost attributable to the construction, reconstruction, erection, installation, or acquisition thereof. Included therein was

---

[1] For example, it might be helpful to know just how the operation of cutting a bench differs from the mining operation after the bench is cut, and how the cost of mining a unit of ore obtained during the cutting of a bench compares with the normal cost of mining a unit of ore. But neither party refers to the absence of this proof.

the $302,742.32 shown in paragraphs (8) and (9) of the stipulation quoted above. The Commissioner has determined that no deduction is allowable to the petitioner under section 23 (t) in respect to those items. The petitioner contends that $73,343.34 spent in 1941 and 1942 for clearing the orebody of trees and underbrush, core drilling, and building access roads at the MacIntyre Mine in 1941 and 1942 is recoverable under the accelerated amortization provisions of section 124 despite the fact that the cost of those items is not recoverable as depreciation under section 23 (1). The Commissioner argues that the acceleration provided by section 124 applies and was intended to apply only to depreciation and Congress had no intention of accelerating the period during which the cost of assets subject to depletion could be recovered.

The petitioner concedes that the expenditures here in question are normally recoverable, not through deductions for depreciation under section 23 (1), but through deductions for depletion under section 23 (m). Congress at no place in section 124 made any mention of depletion or of section 23 (m) and depletion is not mentioned at any time in the legislative history of the section, whereas depreciation is mentioned frequently. If depletion deductions based upon cost were used, $73,343.34 would be included in the cost to be recovered and if Congress intended the accelerated amortization of section 124 to apply it would have said "in lieu of the deduction with respect to such facility for such month provided by section 23 (m)," as it provided in regard to depreciation. See also sec. 124 (c), (d) (2), and (g). This petitioner is not using cost depletion with respect to the MacIntyre Mine but has sought herein and is being allowed the more favorable percentage depletion, which, in lieu of deductions based upon cost, gives deductions larger than those based upon costs. The petitioner, without giving up any part of those percentage depletion deductions, seeks in this issue, a second depletion deduction based upon the cost of these depletable items. This Court gave reasons in *Arkansas-Oklahoma Gas Co.*, 17 T. C. 1208, why it thought section 124 did not apply to depletion, some of which would apply here. The Court of Appeals for the Eighth Circuit reversed, 201 F. 2d 98, thinking that the Tax Court had overlooked the purpose of section 124. Perhaps the present case is different from that one but, in any event and with all due respect, we think that section 124 does not allow and was not intended to allow the double deductions claimed under this issue.

### Reduction Bad Debt.

The petitioner claims as a bad debt deduction for 1943, $2,058,850.57, representing the difference between $3,000,000 received in settlement in 1943 and $5,058,850.57 advanced by the petitioner over a long prior

period to Combined Metals Reduction Company, herein called Reduction. The Commissioner contends that the advances were capital contributions rather than loans.

E. H. Snyder, an experienced mining engineer, secured leases on ground in Utah containing lead-zinc sulphite ores. He organized a partnership and, in 1915, organized Combined Metals, Inc., a corporation herein called Combined, to develop the orebody and its metallurgy. Combined owned processes for treating its complex ores. Combined obtained about $300,000 from the sale of its stock. Its efforts to produce commercial products from its ores during the period 1915 to 1923 were unsuccessful.

The petitioner was interested in the development of sources of supply of lead and zinc. It had a smelter at Florence, Colorado, which was successfully treating complex lead-zinc ores. Snyder interested the petitioner in the processes owned by Combined. The petitioner built a pilot plant, in which the processes were satisfactorily tested and agreed to lend $300,000 to build a commercial plant.

Combined organized Reduction in 1923 and transferred its principal assets to Reduction in exchange for all of the stock of Reduction, 10,000 shares of $100 par value. The petitioner then loaned Reduction $320,000, less $21,200, the cost of the pilot plant, and received from Combined as a bonus, 2,000 shares of Reduction stock, an option to purchase 3,000 shares at par and an option to purchase 100 shares for $3,000. Those options were never exercised. The loan was evidenced by Reduction's note payable May 1, 1926, with interest. It was secured by a mortgage.

That was the beginning of a long series of similar loans made by the petitioner to Reduction in efforts to help Reduction make a success of its mining and metallurgy business. The process which was successful in the pilot plant proved unsuccessful in the commercial plant due to its corrosive effect upon the equipment. More money was required to develop another process and for other needs which developed from time to time. Snyder would make new deals with the petitioner as necessities arose. It was soon apparent that the loans could not be fully repaid unless Reduction could become successful and that interest could not be paid currently. However, the obligation to pay the interest continued. The petitioner became reluctant to advance more funds after 1939, finally notified Snyder in 1943 that no further advances would be made and demanded repayment.

Meanwhile Combined had had to give the petitioner additional shares from time to time in order to obtain additional loans. Such bonuses are common practice in mining financing. The petitioner owned 15,000 and Combined owned 5,000 shares in 1941, and in 1943 the petitioner owned 18,000 and Combined 2,000. The petitioner surrendered all of its shares to Reduction in 1943. Snyder then obtained new financial aid and paid the petitioner $3,000,000 in com-

plete settlement of the indebtedness due from Reduction. The principal amount then due was $5,058,850.57.

The petitioner deducted $2,058,850.57 on its 1943 return as a partially worthless debt and the Commissioner disallowed the deduction.

The Commissioner argues that the $5,058,850.57 represented contributions to capital rather than loans because the petitioner owned a majority of the stock of Reduction, controlled its board of directors, never received any interest, and never demanded repayment until 1943; Reduction's capital was thin; and Reduction was never able to repay the loans until it borrowed from a new source. The Commissioner does not cite any case with facts closely parallel to those of the present case but recognizes that each case must be decided on its own facts. The petitioner likewise recognizes that the decision must depend upon the facts in this particular case. However, in its reply brief it cites and relies upon *Earle* v. *W. J. Jones & Son, Inc.*, 200 F. 2d 846, as a case involving facts similar to those here present.

The petitioner was unwilling to purchase stock of or to make capital contributions to Reduction. The advances were loans in form and were so regarded and accounted for throughout. There is positive testimony from Snyder that they were intended to be loans, loans which he obtained with great difficulty and which were to be repaid. The petitioner had no interest in Combined. The latter remained a stockholder of but never made any loans to Reduction. Combined alone contributed the capital of Reduction. The record does not show that it was thin at the time contributed. It was thought originally that the $300,000 loan would enable Reduction to succeed but failures, disappointments, opportunities, and expansions led to further loans. The character of the advances did not change. The petitioner was not originally a stockholder of Reduction, never bought any Reduction stock, but received stock from Combined as a bonus for making loans. Finally it surrendered the stock and owned none when the indebtedness was settled for less than the full amount.

The evidence as a whole does not justify the Commissioner's conclusion that the advances were contributions of capital but preponderates in favor of the contention of the petitioner. It is hereby found as a fact from the entire record that the $5,058,850.57 was a debt owed to the petitioner by Reduction. That finding disposes of the only difference between the parties on this issue.

### Ponte Vedra Bad Debt.

Two engineers discovered ilmenite sands in northern Florida and obtained financial and technical assistance in developing and exploiting the deposits from Titanium Alloy Manufacturing Company, herein called Titanium Alloy. The engineers then organized a corpo-

ration, herein called Ponte Vedra, to continue the development and exploitation of the titaniferous sands. Ponte Vedra issued 3,600 shares to Titanium Alloy and 2,400 shares to the engineers. Ponte Vedra then began to extract the minerals from the sand deposits. Titanium Alloy organized Titanium Pigment Company, Incorporated, herein called Titanium Pigment, in 1916, because it appeared that the titanium ores would be commercially useful in the pigment field. Titanium Alloy transferred to Titanium Pigment the exclusive right to use and operate under patents relating to the processing of titanium ores into pigments and related products. Titanium Pigment issued 30,000 shares to Titanium Alloy. The ilmenite production of Ponte Verda was made available to Titanium Pigment.

The petitioner became interested in the patent rights owned or controlled by Titanium Alloy and Titanium Pigment and in the ilmenite production of Ponte Vedra, and purchased 15,000 shares of Titanium Pigment stock from Titanium Alloy on or prior to February 28, 1921. The capital stock of Titanium Pigment was twice increased and the petitioner acquired additional outstanding shares of Titanium Pigment, but at least 7,100 shares out of the total 50,000 shares outstanding on November 18, 1929, were owned by others. The petitioner acquired all of those remaining outstanding shares on December 31, 1932, and thereafter owned all of the outstanding stock of Titanium Pigment.

Titanium Alloy had transferred its 3,600 shares of Ponte Vedra stock to Titanium Pigment in March 1921, and by the end of 1922 Titanium Pigment had become the owner of 5,721 out of the 6,000 shares of outstanding stock of Ponte Vedra, and by the end of 1925 Titanium Pigment was the owner of all of the outstanding shares of Ponte Vedra. The stock of Ponte Vedra was reduced to 1,000 shares in October 1933.

Ponte Vedra had net losses for Federal income tax purposes for all of the years beginning in 1923 through 1932 except for the years 1925 and 1926 when it had net income. Titanium Pigment had net income for Federal income tax purposes for all of the years beginning in 1923 through 1932 except for a loss in 1924, and for each year of that period filed a consolidated return with Ponte Vedra as affiliated corporations as a result of which losses of Ponte Vedra for the period in the total amount of $307,613.49 were availed of to reduce the income of Titanium Pigment in the consolidated group, which income would otherwise have been taxable.

National Lead and other corporations, including Titanium Pigment and Ponte Vedra, filed a consolidated return for 1933 in which the net loss of Ponte Vedra in the amount of $42,015.67 was availed of to reduce income of the consolidated group which would otherwise have been taxable.

Titanium Pigment had advanced funds to Ponte Vedra against the latter's notes, the total amount of which was $837,970.39, on October 31, 1936, at which date there was also due Titanium Pigment from Ponte Vedra $20,557.75 representing interest on the notes. There was also a balance due to Titanium Pigment from Ponte Vedra in an open account on October 31, 1936, in the amount of $794,743.64.

National Lead caused Titanium Pigment to be dissolved and liquidated on October 31, 1936, and, as the sole stockholder, acquired all of the assets and assumed all of the liabilities of Titanium Pigment, including, among the assets, the note, interest, and open account indebtedness of Ponte Vedra to Titanium Pigment and all of the 1,000 shares of outstanding Ponte Vedra stock. No gain or loss was recognized to the petitioner as a result of the liquidation and dissolution of Titanium Pigment under the provisions of section 112 (b) (6) of the Revenue Act of 1936.

Mining the sands owned by Ponte Vedra became uneconomical and the operations were discontinued after which Ponte Vedra endeavored to develop its extensive shore properties for residential and resort purposes. It sold all of its properties and assets in December 1942 and thereafter its sole assets were $26,314.96 in cash and a mortgage in the face amount and of the fair market value of $479,831.98. It transferred those assets to the petitioner on December 31, 1942.

The petitioner in its return for 1942 deducted $1,396,620.37 as a bad debt under section 23 (k) (1). The amount included the note, accrued interest, and open account indebtedness of Ponte Vedra on October 31, 1936, together with additional indebtedness owed the petitioner by Ponte Vedra contracted after that date. The cash and mortgage were subtracted from the total indebtedness and the amount deducted represented the difference. The petitioner also deducted on that return $46,276 as a loss under section 23 (f) and 23 (g) (4).

The Commissioner, in determining the deficiency for 1942, disallowed to the extent of $349,629.16 the bad debt and loss deductions claimed. The amount disallowed represented the losses of Ponte Vedra in the amount of $307,613.49 which were availed of during the period 1923 through 1932 to reduce the income of the consolidated group consisting of Ponte Vedra and Titanium Pigment, and the $42,015.67 loss of Ponte Vedra for the calendar year 1933 which reduced the income of the consolidated group including the petitioner.

The petitioner concedes that the disallowance of the $42,015.67 was proper. The following is from its brief:

We do not contest the well-established rule that if a taxpayer was a member of an affiliated group which filed consolidated returns, and if income taxes of the group were reduced by losses of another member of the group, then, upon liquidation, or upon sale of the stock, of such other member of the group, any bad debt or other loss otherwise available to the taxpayer by reason of such

liquidation or sale must be reduced by so much of such prior losses of such other member of the group as resulted in direct tax benefit to the group or a member thereof. This rule is amply supported by judicial authority,[31] and is incorporated in the respondent's regulations relating to consolidated returns.[32]

The petitioner argues that, although Titanium Pigment would have been denied the portion of the losses represented by the $307,613.49 of Ponte Vedra losses which offset its income on consolidated returns, nevertheless the petitioner is not Titanium Pigment; the petitioner was a stranger to the affiliated group throughout the period when its losses occurred; the consolidated return regulations and the cases which established the rule do not apply; and since the petitioner is not seeking the benefit of any double deduction there is no rule prohibiting deduction of the full amount which it is now claiming.

This petitioner did not lend the money to Ponte Vedra, it was not the creditor on the open account, and the interest on the notes did not accrue to it. Those transactions were between Ponte Vedra and Titanium Pigment. The right which the petitioner has to claim bad debt deductions based upon those amounts and upon the cost of the Ponte Vedra stock came to it by reason of the dissolution and liquidation of Titanium Pigment at a time when the petitioner was the sole stockholder of Titanium Pigment. No gain or loss to the petitioner was recognized on the liquidation of Titanium Pigment because of the provisions of section 112 (b) (6) of the Revenue Act of 1936 dealing with property received by a corporation on complete liquidation of another. Section 113 (a) (15) of the Revenue Act of 1936 provided that the basis of property received by a corporation upon a distribution in complete liquidation of another corporation within the meaning of section 112 (b) (6) would be the same in the hands of the transferee "as it would be in the hands of the transferor." The purpose of Congress in enacting that provision was to place the transferee in the transferor's shoes with respect to the property transferred so that any inherent gain or loss would work itself out in the future for tax purposes. Thus the petitioner stepped into the shoes of Titanium Pigment with respect to the Ponte Vedra indebtedness and stock here in question, with the result that the regulations and the decisions cited by the petitioner apply to it. The reasons for the decisions and for the regulations apply just as much when the petitioner attempts to take a deduction for these losses as they would had the original creditor

---

[31] *Ilfeld Co.* v. *Hernandez,* 292 U. S. 62 (1934) ; *McLaughlin* v. *Pacific Lumber Co.,* 293 U. S. 351 (1934) ; *Greif Cooperage Corp.* v. *Commissioner,* 85 Fed. 2d 365 (C. A. 3, 1936) ; *Commissioner* v. *National Casket Co.,* 78 Fed. 2d 940 (C. A. 3, 1935) ; *Singer Mfg. Co.* v. *U. S.,* 116 Ct. Cl. 876 (1950) ; *Cincinnati Milling Machine Co.* v. *U. S.,* 14 Fed. Supp. 505 (U. S. Ct. Cl. 1936) ; *Doylestown and Eastern Motor Coach Co.,* 9 T. C. 846 (1947) ; *Bush Terminal Buildings Co.,* 7 T. C. 793 (1946).

[32] Regs. 75, Arts. 34 (c) (2), 35, and 40 ; Regs. 78, Arts. 34 (c) (2), 35, and 40, Cf. Regs. 110, secs. 33.34 (c) (2), 33.35, and 33.40 ; and Regs. 129, secs. 24.34 (c) (2), 24.35, and 24.40.

claimed the deduction. The point is that the original creditor had already received the benefit of a deduction to the extent of the $307,613.49 and that portion of the indebtedness had been washed out for the purpose of any further income tax deduction, that is, the creditor's bases, in effect, had been reduced by that amount. The Commissioner did not err in this connection.

### Pesos Loss.

The petitioner organized a corporation under the laws of the Argentine Republic in 1917 with offices and a plant in Buenos Aires. The purpose was to avoid the high Argentine tariff on imports and to serve customers in Argentina and other portions of South America more efficiently by manufacturing in Argentina. The petitioner, at all times material hereto, has owned all of the stock of the Argentine company, hereafter called Argentine. There were frequent transactions between the petitioner and Argentine over a long period of years. The petitioner shipped metals, materials, and supplies and rendered various services to Argentine for which amounts became due from Argentine to the petitioner. Credits to the account of Argentine resulted from goods and services supplied by it to the petitioner. The petitioner recorded all of those transactions on its books in dollars in an intercompany account. Goods and services were entered at cost. Argentine made similar entries in its books.

The petitioner learned at the close of 1930 that it would receive from a British corporation a dividend of approximately $400,000 which was taxed at the source at the rate of 22½ per cent. The United States income tax rate on corporations at that time was 12½ per cent, and the operation of the foreign credit provisions of the internal revenue laws then in effect was such that the petitioner could receive an additional dividend from foreign sources of approximately $350,000 without increasing its United States income tax liability. It therefore requested Argentine to pay a dividend of $350,000, but Argentine discovered and informed the petitioner that because of the decline in value of the Argentine peso its books would show a deficit and it would not be able to pay a legal dividend, if the debit balance due the petitioner was to be computed in dollars or in pesos at the going rate, but if the debit balance were to be computed in pesos at the par rate of exchange its books would show a surplus permitting the payment of the dividend. The petitioner and Argentine thereupon agreed that the debit balance should be payable in pesos at par. The dividend was declared and the $350,000 was credited to the petitioner and debited to the Argentine company in 1930. That was the only debit to Argentine in the intercompany account at any time which did not arise out

of goods shipped or services rendered. Thereafter additional debits and credits were made in the intercompany account as previously.

The petitioner never called upon Argentine to liquidate the debit balance in the intercompany account except as credits occurred in the ordinary course of business, until about the middle of 1939 when world conditions prompted it to consider ways and means of liquidating the debit balance as rapidly as possible. $2,067,291.93, the amount of debit balance owed by Argentine as of December 30, 1930, was transferred in 1939 from the intercompany account to a new account called the loan account. The amount was credited to Argentine in the intercompany account. That was the only credit to Argentine in the intercompany account which did not arise out of goods shipped or services rendered. The petitioner and Argentine agreed that the debit balance of Argentine in the new loan account should be liquidated as rapidly as possible. Argentine purchased $631,731.66 in Buenos Aires in 1939 for 2,723,252.53 Argentine pesos and paid the dollars to the petitioner in reduction of the debit balance in the loan account. Simultaneously the debit balance in the loan account was reduced by the additional amount of $527,099.20, being the difference between the actual dollars which the 2,723,252.53 pesos purchased at the prevailing rate of exchange and the number of dollars which that number of pesos would represent if reduced to dollars at the par rate of exchange. Argentine purchased $200,000 with pesos in 1940 and the amount of $196,672.49 was also credited to the loan account, representing the difference between the exchange of pesos at the going rate of exchange and at par. Likewise, Argentine purchased $283,-200.96 with pesos in 1942 and an additional $228,587.62 was credited to the loan account to represent the difference between pesos at the going rate of exchange and at par. The petitioner in its returns for 1939, 1940, and 1942 deducted as exchange losses the $527,099.20, the $196,672.49, and the $228,587.62, representing the amounts applied against the debit balance in the loan account which were not received by the petitioner but were applied pursuant to the agreement that the debit balance should be payable in pesos at par. The Commissioner did not disallow the deductions for 1939 and 1940. The petitioner's tax liabilities for those years are closed. He disallowed the deduction for 1942.

The so-called par rate of exchange was 2.35 pesos for $1. The prevailing market rate of exchange had averaged 2.25 in 1918, 2.30 in 1919, and thereafter was less favorable to the pesos than 2.35, ranging from 3.11 in 1921 to 2.36 in 1927 and 1928. It was 3.02 in December 1930 when the arrangements were made in regard to the dividend. Thereafter it fluctuated between 3.23 in 1933 and 1937 to 4.37 in 1940. Argentine had been successful. Its earnings grew from about 53,000

pesos in 1932 to 1,720,937.44 in 1944. Its capital stock had been increased by stock dividends from 1 million pesos to 2 million in 1940, 4 million in 1941, and 5 million in 1942. It had at the close of 1941 a surplus of 1,187,264.16 pesos, "surplus reserves" of 720,048.91 pesos, and cash in the amount of 696,374.31 pesos.

The petitioner claims that the amount of $228,587.62 is deductible as a bona fide foreign exchange loss for 1942. It says

By agreeing in 1930 to accept pesos at par in liquidation of the dollar debt, the petitioner in substance and effect purchased pesos; by applying the dollar proceeds of pesos sold in 1942 to the debt on the agreed basis, the petitioner in substance and effect sold pesos, to complete the transaction. Gains and losses in completed transactions in foreign exchange are recognized for tax purposes. As it happens, the petitioner did not realize a gain, but a loss. Under section 23 (f) of the Code, and under the respondent's regulations, that loss is clearly deductible.

The petitioner voluntarily agreed to accept payment of the December 31, 1930, debit balance in the intercompany account in pesos at par, although the going rate of exchange was then more favorable to it. Argentine was then solvent, and the record does not show that the debit balance due from Argentine in the intercompany account or in the loan account was ever worthless even in part. The indications are that Argentine was always able to pay that indebtedness had occasion arisen. There was no need for the petitioner to accept any loss in connection with this account and it does not claim a bad debt. It charged Argentine for goods and services at the cost of those goods and services in dollars. The account was kept in dollars. All payments were actually made in dollars by Argentine, but, when Argentine paid the loan account in dollars, the petitioner voluntarily gave Argentine credit for the additional amount which the pesos used by Argentine to purchase the dollars would have represented if the exchange rate had been 2.35. The petitioner never had any transactions in pesos or foreign exchange. Instead it furnished goods and services to its wholly owned subsidiary, charged them at cost, and then agreed to take an amount less than cost in payment. That represents a contribution to the subsidiary and does not represent a loss from dealing in foreign exchange or a loss of any other kind.

### War Facility Amortization.

The petitioner acquired, dissolved, and, after June 30, 1944, carried on the business of the American Bearing Corporation. American Bearing had filed applications for certificates of necessity to cover the cost of constructing facilities for the purpose of producing war products. Certificates of necessity respecting those facilities were issued pursuant to section 124 of the Internal Revenue Code, stating

that the facilities "are necessary in the interest of national defense during the emergency period, up to 50% [in some 35%] of the cost." The facilities were constructed. The purpose of the certificates was to permit the petitioner to amortize the cost of the additional facilities over a period of 60 months rather than recover their cost through depreciation deductions over the normal useful lives of the facilities. The petitioner claimed accelerated depreciation for the entire cost of the facilities, but the Commissioner limited the accelerated amortization to the percentages fixed in the certificates of necessity. The petitioner contends that the percentage limitations which the certifying authorities purported to impose must be ignored because they are in violation of the words of and the intention of Congress behind section 124.

Section 124 (a) provides that every person, at his election, shall be entitled to a deduction with respect to the amortization of the adjusted basis of any emergency facility based upon a period of 60 months. Subsection (e) defines emergency facility as "any facility, land, building, machinery, or equipment, or part thereof, the construction, reconstruction, erection, installation, or acquisition of which was completed after December 31, 1939, and with respect to which a certificate under subsection (f) has been made." Section 124 (f) (1) provides that in determining the adjusted basis of an emergency facility "there shall be included only so much of the amount otherwise constituting such adjusted basis as is properly attributable to such construction, reconstruction, erection, installation, or acquisition after December 31, 1939, as either the Secretary of War or the Secretary of the Navy has certified as necessary in the interest of national defense during the emergency period" under regulations prescribed by the certifying authority with the approval of the President. The certificates in question were for construction after December 31, 1939, and it is conceded that the adjusted basis of that construction is cost.

The petitioner contends that the words "only so much of the" cost refer to construction after December 31, 1939, and that the provision may not be read "the cost attributable to so much of such construction as the certifying authority has certified as necessary in the interest of national defense during the emergency period." It says the certifying authority was to certify facilities, not costs.

The United States Graphite Company sought to compel the certifying authorities to issue certificates which would cover all rather than only part of the cost of facilities which it had constructed. The District Court for the District of Columbia dismissed the complaint. *United States Graphite Co.* v. *Harriman*, 71 F. Supp. 944. The Court of Appeals for the District of Columbia affirmed per curiam without opinion, but Judge Wilbur K. Miller filed a dissent in which he dis-

cussed the problem. *United States Graphite Co.* v. *Sawyer*, 176 F. 2d 868, certiorari denied 339 U. S. 904. That taxpayer then sued on a claim for refund of taxes in the Court of Claims on the ground that the percentage of cost limitation on its certificates should be ignored. The Court of Claims held for the taxpayer, and the Government did not seek a writ of certiorari. *Wickes Corp.* v. *United States*, 108 F. Supp. 616.[2]

Judge Miller, in his dissenting opinion referred to above, considered and discussed the words used by Congress, the purpose which it sought to accomplish, and the legislative history of section 124. He stated, "After exhaustive study, I have been able to discover nothing in the language of the Act, or in its legislative history, to indicate that Congress intended to give the certifying agency the right to determine that only a portion of the cost of a necessary facility could be amortized." His interpretation of section 124 (f) (1) was that it meant "there shall be included as amortizable cost only so much of the cost of the facility as is properly attributable to the part of it which was constructed after December 31, 1939, and which has been certified as necessary in the interest of national defense." The Court of Claims came to the same conclusion. This Court believes that the reasoning of Judge Miller in his dissenting opinion and of the Court of Claims is sound and that a correct interpretation of the provisions of section 124 entitles the petitioner in this case to amortize the full cost of the facilities certified over the accelerated period.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

OPPER, *J.*, dissents on the last issue on the authority of *United States Graphite Co.* v. *Sawyer*, (C. A., D. C. Cir.) 176 F. 2d 868, certiorari denied 339 U. S. 904; and in consonance with the dissenting opinion of Chief Judge Jones in *Ohio Power Co.* v. *United States*, (Ct. Cl.) 129 F. Supp. 215.

---

[2] The Wickes Corporation was the successor to the United States Graphite Company. The cases also involved another issue which is not in the present case.