FORT HOWARD CORPORATION AND SUBSIDIARIES, PETITIONER
*v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6362–92.          Filed August 24, 1994.

*James L. Malone III, Kristen E. Hazel,* and *Lonn W. Myers,* for petitioner.

*Lawrence C. Letkewicz, William E. Bogner,* and *Dana E.P. Hundrieser,* for respondent.

RUWE, *Judge:* Respondent determined deficiencies in petitioner's 1985 and 1988 Federal income taxes in the respective amounts of $2,445,098 and $32,557,015.

After severance of certain issues for trial and concessions by the parties, the issues for decision are: (1) Whether certain deductions taken by petitioner in 1988 are prohibited by section 162(k);[1] and (2) whether certain expenses incurred by petitioner in 1988 constitute a fee for services as opposed to interest deductible under section 163.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, first and second supplemental stipulations of facts, and attached exhibits are incorporated herein

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

by this reference. During 1988, petitioner was a corporation engaged in manufacturing, converting, and marketing a diversified line of single-use paper and plastic products including table napkins, paper towels, bath tissue, wipers, and boxed facial tissues. Petitioner is incorporated in Delaware and has its principal office in Green Bay, Wisconsin.

The facts in this case surround the 1988 leveraged buyout (LBO) of petitioner. In early 1988, petitioner's management was concerned about the market price of petitioner's common stock, which had declined considerably in prior months. After consultation with Morgan Stanley Group, Inc. (Morgan Stanley), petitioner's management concluded that an LBO would be the best way to increase stockholder value. On April 6, 1988, during consultations with management, Morgan Stanley proposed an LBO timetable that included: (1) A tender offer for petitioner's stock commencing during weeks 11 to 14; (2) expiration of the tender offer and purchase of tendered shares in week 15; (3) merger of the acquisition vehicle into petitioner; (4) filing the SEC Form S1 registration statement for the sale of permanent debt in week 16; and (5) closing the sale of permanent refinancing debt in weeks 20 to 24. All the significant planning documents [2] contemplated a similar, if not identical structure, including a prompt refinancing via long-term debt after the merger. On June 7, 1988, petitioner's outside directors granted petitioner's management permission to explore the possibility of an LBO.

Petitioner's management and Morgan Stanley made two formal proposals to petitioner's board of directors. On June 25, 1988, the board voted to accept the second, which proposed—at a price of $53 per share—an LBO of petitioner by its senior management, its largest individual shareholder, and outside investors consisting principally of Morgan Stanley, certain institutional investors,[3] and Bankers Trust Co.

---

[2] These planning documents included: (1) Preliminary evaluations regarding the viability of an LBO, which were presented by Morgan Stanley to petitioner's management; (2) the formal proposal memorandum addressed to officers of Morgan Stanley's merchant banking department; (3) the loan proposal memorandum from Bankers Trust Co.; (4) internal memoranda from Morgan Stanley's Merchant Banking group to Morgan Stanley's commitment and management committees; and (5) the actual agreement and plan of merger.

[3] These included Morgan Stanley International (a wholly owned London-based subsidiary of Morgan Stanley), Morgan Stanley Leveraged Equity Fund II L.P. (a partnership formed by Morgan Stanley for the purpose of investing in leveraged buyout transactions, hereinafter referred to as MSLEF II), First Plaza Group Trust (on behalf of certain General Motors pension plans), and Leeway & Co. (on behalf of certain AT&T pension plans).

(Bankers Trust) (hereinafter collectively referred to as the investors). Bankers Trust and a syndicate of 27 banks would provide bank financing for the transaction. Morgan Stanley played a substantial role in getting the commitment from the five lead banks and in selling the LBO as a credit risk to the remaining banks in the bank syndicate. It also acted as financial adviser and dealer manager for all stages of the LBO.

Pursuant to the agreement and plan of merger (merger plan), Morgan Stanley organized FH Holdings Corp. (FH Holdings) and its wholly owned subsidiary, FH Acquisition Corp. (FH Acquisition), on June 22 and 23, 1988, respectively. Under the merger plan, the investors would initially become shareholders of FH Holdings. FH Acquisition would receive debt capital for the purpose of making a tender offer for all petitioner's outstanding shares. After the tender of shares, FH Holdings would merge into FH Acquisition, and the combined entity would then merge into petitioner.

In order to procure adequate capital for the tender offer, FH Acquisition obtained commitments from several of the investors to purchase subordinated floating-rate bridge notes (bridge notes) to be issued by it. The proceeds from the bridge note issuance would cover the difference between the bank financing and the cost of the shares to be tendered. As part of the merger plan, the bridge notes were to be replaced with long-term, fixed-rate subordinated notes and debentures (hereinafter referred to as permanent financing or permanent debt) as soon as the LBO was completed.[4] For numerous reasons, Morgan Stanley was "highly confident" of its ability to underwrite the permanent financing. These reasons included the quality of petitioner's management, the quality of petitioner's production technology and its advancement over the technology of petitioner's competitors, the consistency of

---

[4] Donald P. Brennan, head of Morgan Stanley's Merchant Banking division, stated at trial that the issuance of permanent debt was "part of the plan" of the redemption. On June 25, 1988, the institutional investors had committed to purchase permanent financing securities of $95 million. In July of 1988, Mr. Brennan contacted Dillon, Read & Co., Inc., regarding the possibility that Dillon Read would act as qualified independent underwriter of permanent financing. On Aug. 1, 1988—7 days before the close of the tender offer—FH Holdings, FH Acquisition, and the investors executed a securities purchase agreement in which the investors made commitments to purchase permanent debt. All the major documents produced by Morgan Stanley relating to the LBO contemplated a "refinancing" of the bridge notes with permanent debt.

petitioner's business, the timing of the LBO in the business cycle of petitioner's industry, and the economic environment.

As of June 30, 1988, FH Acquisition had obtained commitments from the investors to purchase bridge notes worth $1.040 billion. Of this amount, $793 million was committed by Morgan Stanley on June 30, 1988. In the commitment letter, FH Acquisition agreed to pay Morgan Stanley a contingent amount—described as additional interest—on the bridge notes.[5] On August 1, 1988, FH Holdings, FH Acquisition, and the investors executed a securities purchase agreement, in which the investors made commitments to purchase bridge and permanent financing. In this agreement, Morgan Stanley International (MSI), a wholly owned subsidiary of Morgan Stanley, agreed to purchase the bridge notes to which Morgan Stanley had previously committed. In consideration for this agreement, FH Acquisition agreed to pay MSI $10,660,000, described as additional interest.

On July 1, 1988, pursuant to the merger plan, FH Acquisition commenced a cash tender offer for all petitioner's outstanding shares. The tender offer terminated on August 8, 1988, and resulted in the tender of approximately 80 percent of petitioner's stock.

On August 9, 1988, in order to purchase the tendered shares, FH Acquisition incurred approximately $1.206 billion in term loans, $400 million in bridge loans, and a $400 million revolving credit facility from Bankers Trust and the bank syndicate.[6] On the same day, FH Acquisition also sold $1.04 billion in subordinated floating-rate bridge notes to MSI and the institutional investors. Of this amount, $533 million of bridge notes was purchased by MSI. By August 11, 1988, MSI had entered into secondary note purchase agreements with respect to $545 million[7] of bridge notes and participation agreements with respect to $60 million of bridge notes.[8] By August 11, 1988, MSI closed on secondary note purchase

---

[5] The agreed additional interest was equal to 1 percent of the following: $793 million less the aggregate principal amount of bridge notes committed to be purchased by certain other investors plus the actual amount of bridge notes purchased by Morgan Stanley.

[6] Each bank's commitment was allocated among the bridge loan, term loan, and revolving credit line on a pro rata basis.

[7] The record does not explain the discrepancy between the amount of notes purchased by Morgan Stanley International (MSI) and those for which it executed secondary agreements and participations.

[8] Twelve of the secondary purchasers (amounting to $39,250,000 of bridge notes) did not fund their purchases until Aug. 12 and/or 15, 1988.

agreements or participation agreements with respect to all but $75 million of the bridge notes it purchased. Also, on August 9, 1988, Morgan Stanley, Bankers Trust, and the institutional investors purchased common stock for $414 million from FH Holdings, which promptly contributed the $414 million to FH Acquisition.

FH Acquisition used $2,835,527,083 of the above financing to purchase the tendered shares on August 9, 1988. On August 17, 1988, FH Acquisition filed a preliminary prospectus with the Securities and Exchange Commission (SEC) for the issuance of the permanent debt. The drafting of the preliminary prospectus had begun in early July 1988. According to an internal Morgan Stanley selling memorandum for the permanent debt, dated September 1988: "The proceeds of the Permanent Financing being offered will be used to refinance the $400 million senior bridge loan and $800 million of subordinated bridge notes", as well as other elements of the bridge financing following the merger of FH Acquisition into petitioner.

On October 24, 1988, FH Holdings was merged into FH Acquisition, with FH Acquisition surviving the merger. Immediately prior to this merger, 32 members of petitioner's management and its largest shareholder purchased shares in FH Holdings. FH Acquisition then immediately merged with and into petitioner, with petitioner as the surviving corporation in the merger. This resulted, after operation of State law, in 100-percent ownership of petitioner by the investors. On November 1, 1988, the permanent financing was issued and used to pay in full the bank bridge loan and all the subordinated floating-rate bridge notes.

Petitioner (through its predecessor, FH Acquisition) incurred and paid numerous expenses in order to complete the LBO. These included fees for the services of Morgan Stanley and the various banks and legal expenses. They also included costs of obtaining the various loans and issuing debt and equity. As to the issuance of debt and loan financing, these costs included commitment fees, transaction fees, bank agency fees, bond trustee fees, interest, and additional interest. On its 1988 return, petitioner treated debt and loan financing costs totaling $169,117,239 as capital expenses. Of the total amount capitalized, petitioner deducted on its 1988

return $43,431,208, representing the costs of debt amortized or retired in 1988.

In a letter dated June 25, 1988, FH Acquisition agreed to pay Morgan Stanley $40 million as a "transaction fee", "In the event that * * * [FH Acquisition] consummates an Acquisition Transaction". The letter was written by Morgan Stanley and signed by a representative of FH Acquisition. The letter further stated:

This letter is to confirm our understanding with you with respect to our engagement. In connection with this assignment, you and we have agreed that Morgan Stanley will assist * * * [FH Acquisition] in its preparation and structuring of the Acquisition Transaction and provide whatever financial advice and assistance may be required in connection therewith.

In the letter, FH Acquisition agreed:

to retain Morgan Stanley as sole dealer manager for the Offer and to enter into a dealer manager agreement with Morgan Stanley in Morgan Stanley's standard form, but not providing for the payment of any fees other than those provided for in this letter agreement. * * *

Morgan Stanley billed FH Acquisition for the $40 million fee on August 8, 1988, by an invoice that described the payment as follows: "For *Financial Advisory Services* rendered in organizing the financing required for the purchase of all the outstanding common shares of Fort Howard Corporation by FH Acquisition Corp." Morgan Stanley's internal documents all describe the $40 million fee as an "organizer fee". FH Acquisition paid the $40 million along with other fees listed in the same invoice, on August 9, 1988. On its 1988 return, petitioner treated $36 million of the $40 million paid to Morgan Stanley as a cost of obtaining the financing for its LBO. Petitioner allocated this $36 million on a pro rata basis over all the various kinds of loans and debt issued in the transaction.[9] Petitioner deducted in 1988 the portion of this amount allocated to debt amortized or retired in 1988.

## OPINION

The first issue for decision is whether section 162(k) precludes petitioner from deducting or amortizing the costs and fees, other than interest, which were paid to obtain the debt

---

[9] Petitioner considered the remaining $4 million (of the $40 million) to be a nondeductible cost of obtaining equity financing.

capital used in its LBO.[10] This is an issue of first impression for this Court.[11] Section 162(k) provides as follows:

SEC. 162(k). STOCK REDEMPTION EXPENSES.—

(1) IN GENERAL.—Except as provided in paragraph (2), no deduction otherwise allowable shall be allowed under this chapter for any amount paid or incurred by a corporation in connection with the redemption of its stock.

(2) EXCEPTIONS.—Paragraph (1) shall not apply to—

(A) CERTAIN SPECIFIC DEDUCTIONS.—Any—

(i) deduction allowable under section 163 (relating to interest), or

(ii) deduction for dividends paid (within the meaning of section 561).

(B) STOCK OF CERTAIN REGULATED INVESTMENT COMPANIES.—Any amount paid or incurred in connection with the redemption of any stock in a regulated investment company which issues only stock which is redeemable upon the demand of the shareholder.

There is no question that petitioner's LBO constituted a redemption within the meaning of section 162(k)(1).[12] The parties center their dispute on whether the deductions at issue were "in connection with" the redemption.

The words in a revenue act should be interpreted in their ordinary, everyday sense. *Commissioner v. Soliman,* 506 U.S. ____, 113 S. Ct. 701, 705–706 (1993) (quoting *Malat v.*

---

[10] Except for portions of the $40 million fee paid to Morgan Stanley, discussed *infra,* the parties have stipulated the characterization of all costs incurred by petitioner as either (1) costs of obtaining equity financing, (2) interest deductible under sec. 163, or (3) costs of obtaining debt financing. The parties have agreed that all amounts stipulated to be equity financing costs are nondeductible. They have also agreed that amounts stipulated to be interest are amortizable pursuant to agreed schedules. Therefore, our only task with regard to this first issue is to determine whether the costs of obtaining debt financing for petitioner's LBO (other than interest) are deductible or amortizable under sec. 162(k).

As to certain portions of the $40 million fee, the parties have agreed that, if such portions do not constitute interest deductible under sec. 163, they constitute costs of obtaining debt financing, the deductibility of which will be controlled by our analysis of sec. 162(k). We will decide, *infra,* whether the disputed portions constitute interest.

[11] Only one decided case has dealt with this issue. See *In re Kroy (Europe) Ltd.,* 27 F.3d 367 (9th Cir. 1994). Numerous commentators have also discussed sec. 162(k). See, e.g., Ginsburg & Levin, Mergers, Acquisitions and Leveraged Buyouts I, CCH Tax Transactions Library par. 402.113; Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, par. 5.04, at 5–31 (6th ed. 1994); Ludtke & Moll, "Loan Fees, LBOs, and the 'Plain Meaning' of Section 162(k): The Ninth Circuit Considers *United States v. Kroy (Europe) Ltd.*", 61 Tax Notes 1605 (1993); "N.Y. City Bar Disagrees With ISP Paper on Amortization of Loan Commitment Fees", 28 Highlights & Documents 1809 (Jan. 27, 1993); Akselrad & Bernstein, "Are Expenses Incurred in Obtaining LBO Loans Deductible?", 20 J. Corp. Taxn. 295, 300 (1993); Kennedy, "The Deductibility of Stock Redemption Expenses Under Section 162(k): *United States v. Kroy (Europe) Ltd.*", 46 Tax Law. 977 (1993).

[12] Petitioner agrees that the statute applies to any redemption. The House report states this explicitly. H. Rept. 99–426, at 248–249 n.15 (1986), 1986–3 C.B. (Vol. 2) 1, 248–249. Petitioner requested and received a ruling from respondent treating the transaction as a redemption of petitioner's stock to the extent of the bank loans and subordinated bridge notes.

*Riddell*, 383 U.S. 569, 571 (1966) (quoting *Crane v. Commissioner*, 331 U.S. 1, 6 (1947))). The phrase "in connection with" has been interpreted broadly. See *Snow v. Commissioner*, 416 U.S. 500, 502–503 (1974) (interpreting section 174(a)(1)). "In connection with" means associated with, or related. *Huntsman v. Commissioner*, 905 F.2d 1182, 1184 (8th Cir. 1990), revg. and remanding 91 T.C. 917 (1988) (interpreting section 461(g)(2)).[13] Events or elements are "connected" when they are "logically related". Webster's Third New International Dictionary 480 (1986). Petitioner used the debt capital obtained via the expenditures in question to finance the redemption. There is a clear logical relation between petitioner's redemption, the corresponding need for financing, and the costs incurred to obtain that financing. Indeed, several of the major documents produced by Morgan Stanley with regard to the LBO financing explicitly refer to the issuance of debt securities and incurrence of loans as "necessary" to the transaction.[14]

Moreover, petitioner's payment of financing costs, its receipt of the debt capital, and the effectuation of the redemption were continuous events. The entire LBO transaction, from conception to completion and refinancing, took

---

[13]*Huntsman* dealt with the meaning of the term "in connection with the purchase" of a taxpayer's principal residence. In *Huntsman*, this Court held that a refinancing that occurred over 2½ years after the date of the home purchase and original mortgage loan was not "in connection with" the purchase of the taxpayer's residence. While the Court of Appeals for the Eighth Circuit reversed our holding in *Huntsman*, there was no disagreement that loans whose proceeds were used to purchase a residence should be considered to be "in connection with" the purchase. Also, in *Huntsman*, we specifically refrained from deciding that all types of refinancing fall outside the meaning of the statutory phrase "in connection with" the purchase. As examples of the type of refinancing that might qualify as being "in connection with" the purchase, we cited situations involving construction loans and "bridge" loans. *Huntsman v. Commissioner*, 91 T.C. 917, 920 n.5 (1988), revd. and remanded 905 F.2d 1182 (8th Cir. 1990).

[14]We undertook a similar analysis in *Indiana Univ. Retirement Community, Inc. v. Commissioner*, 92 T.C. 891, 896 (1989), and reached the same conclusion. In that case, the issue was whether the taxpayer, a tax-exempt private foundation, could deduct, under sec. 4940(c)(3)(A), interest expense it incurred on a municipal bond issuance, the proceeds from which it invested in income-generating assets. Deductibility turned on whether the interest expense had a "nexus" with the earning of the investment income. This Court stated:

In this case, the central fact is that petitioner would have had no investment income * * * except for its return on investment of the bond proceeds. Petitioner generated gross investment income by investing the bond proceeds, and, as the bond prospectus states, petitioner's intent to invest temporarily the bond proceeds was explicitly for the purpose of obtaining investment income which would be used in the project. Further, petitioner would have had no funds to invest but for the issuance of the bonds. In the absence of the interest payments, the debt underlying the bonds would have been in default, and petitioner could have lost the use of the bond proceeds. *Consequently, the interest expense on the bonds and the gross investment income from petitioner's investment of the bond proceeds arose out of the same transaction and were inextricably connected.* * * * [*Id.*; emphasis added.]

only 8 months. The costs at issue were all incurred and paid during that time. These costs (and the debt capital obtained through them) were an integral part of a detailed plan which Morgan Stanley described as a "proprietary" strategy for funding the transaction. Thus, the financing costs were both a cause and an effect of the LBO. From an "ordinary, everyday" perspective, therefore, petitioner's financing costs were "in connection with" the redemption. Assigning a broad construction to the phrase, we reach this conclusion all the more easily.

In *In re Kroy (Europe) Ltd.,* 27 F.3d 367 (9th Cir. 1994), the Court of Appeals for the Ninth Circuit addressed the question at issue in this case, reaching a result contrary to the one we reach today. The Court of Appeals agreed that the "in connection with" inquiry is the critical one in interpreting section 162(k), stating: "it is * * * necessary to decide in the first instance whether or not the expenditure was incurred 'in connection with' a stock redemption before IRC section 162(k) applies." *Id.* at 369 n.3. Nevertheless, the Court of Appeals did not analyze the phrase "in connection with", nor did it look to the previous use of the phrase by Congress or the meaning attributed to it by the Federal courts. Instead, the Court of Appeals relied on other doctrines not referred to in the statute.[15] We believe our analysis of the phrase "in connection with" comports with congressional intent and judicial precedent; therefore, we respectfully decline to follow the holding of the Court of Appeals.

Congress expressly imparted a broad application to the phrase as used in section 162(k). The conference report states that "the phrase 'in connection with [a] redemption' is intended to be construed broadly," and that deductions for expenses will be disallowed if they are "related to" the redemption. H. Conf. Rept. 99–841, at 168–169 (1986), 1986–3 C.B. (Vol. 4) 1, 168–169.[16] The Senate report, which the

---

[15] See *infra* for our discussion of these doctrines.

[16] In *Huntsman v. Commissioner,* 905 F.2d at 1185, the Court of Appeals for the Eighth Circuit stated:

When Congress adopted "in connection with" for use in section 461(g)(2), it was aware of the Supreme Court's interpretation of the same language in *Snow.* Therefore, it is reasonable to assume that they intended the same broad interpretation to be given to section 461(g)(2). See *Miller v. Commissioner,* 836 F.2d 1274, 1282 (10th Cir. 1988). Thus, based on the language of the statute and past judicial interpretations of that language, we conclude that section 461(g)(2) should be broadly construed. [Fn. ref. omitted.]

conference report generally follows, is even more explicit. It states:

The committee intends that amounts subject to this provision will include amounts paid to repurchase stock; premiums paid for the stock; legal, accounting, brokerage, transfer agent, appraisal, and similar fees incurred in connection with the repurchase; *and any other expenditure that is necessary or incident to the repurchase* * * * [S. Rept. 99–313, at 223 (1986), 1986–3 C.B. (Vol. 3) 1, 223; emphasis added.]

The exception in section 162(k)(2)(A)(i) for interest deductions also supports our interpretation. Interest is a cost of financing. There would simply have been no need to provide an exception if related financing costs in general were not considered to be in connection with a redemption. The evolution of the exception is illustrative. The Senate added the interest exception as an amendment to the House bill, which provided for no exceptions to the general disallowance rule. That the Senate believed the exception necessary indicates that interest, had it not been excepted, would indeed have been disallowed. This is supported by the explanation of the change that is contained in the conference report:

The Senate amendment is generally the same as the House bill, except the provision does not apply to (1) interest deductible under section 163 * * * [H. Conf. Rept. 99–841, at 168 (1986), 1986–3 C.B. (Vol. 4) 1, 168.]

The clear implication is that the "in connection with" phrase would include interest were it not for the interest exception added by the Senate. There is no exception, however, for other costs of financing.

Petitioner and the Court of Appeals in *In re Kroy (Europe) Ltd., supra,* contend that the interest exception was provided for situations in which stock is redeemed by issuing a debt instrument to the stockholder. See *In re Kroy (Europe) Ltd., supra* at 369 n.3. In such cases, petitioner suggests, interest payments to the former stockholder potentially could have been characterized as actual consideration for the stock. The exception, according to petitioner, prevents such treatment. There is simply no support for this theory in the legislative history.[17] As more fully explained *infra,* , according to

---

[17] Petitioner notes certain other legislative proposals in 1986 and 1987 dealing with the disallowance of interest deductions. See "N.Y. City Bar Disagrees With ISP Paper on Amortization of Loan Commitment Fees", 28 Highlights & Documents 1809 (Jan. 27, 1993). Since these proposals were not enacted, however, reliance on them would be little better than speculation.

petitioner's interpretation of the phrase "in connection with", financing costs, including interest, would never be considered to be incurred in "connection with a redemption". Were we to accept petitioner's interpretation of the "in connection with" language, the exception for interest would become redundant. Apparently recognizing this, petitioner suggests that Congress was simply acting "out of an abundance of caution" in providing for an interest exception. We cannot accept the idea that Congress would provide a specific exception for all "[deductions] allowable under section 163 (relating to interest)" merely out of an abundance of caution, while at the same time showing no apparent concern about leaving a broadly worded disallowance provision in place that literally applies to all other financing costs. If the exception for interest has any meaning, it must be that the costs of financing are covered by the "in connection with" language of section 162(k) when the financing is inextricably related to a redemption.

Petitioner notes that, historically, financing costs have been amortizable over the life of a loan.[18] Petitioner contends that neither section 162(k) nor its legislative history mentions this historic treatment or gives any indication of an intent to change it. Indeed, petitioner argues that section 162(k) was enacted solely to "clarify" prior law. From this, petitioner concludes that the law concerning financing costs remains unchanged.

Specifically, petitioner contends that section 162(k) clarified that the decision in *Five Star Manufacturing Co. v. Commissioner,* 355 F.2d 724 (5th Cir. 1966) (allowing deduction for "greenmail payments" necessary for corporate sur-

---

[18] *Detroit Consol. Theatres, Inc. v. Commissioner,* 133 F.2d 200 (6th Cir. 1942) (per curiam); *Duffy v. United States,* 231 Ct. Cl. 679, 690 F.2d 889 (1982) (per curiam); *Goodwin v. Commissioner,* 75 T.C. 424, 441 (1980), affd. without published opinion 691 F.2d 490 (3d Cir. 1982); *Duncan Indus., Inc. v. Commissioner,* 73 T.C. 266, 275 (1979); *Lay v. Commissioner,* 69 T.C. 421, 438 (1977); *Cagle v. Commissioner,* 63 T.C. 86, 97 (1974), affd. 539 F.2d 409 (5th Cir. 1976); *Enoch v. Commissioner,* 57 T.C. 781, 794–795 (1972); *Anover Realty Corp. v. Commissioner,* 33 T.C. 671, 675 (1960); *Longview Hilton Hotel Co. v. Commissioner,* 9 T.C. 180, 182 (1947); *Plaza Invest. Co. v. Commissioner,* 5 T.C. 1295, 1297 (1945); *S & L Bldg. Corp. v. Commissioner,* 19 B.T.A. 788, 795 (1930), revd. on other grounds 60 F.2d 719 (2d Cir. 1932), revd. *Burnet v. S & L Bldg. Corp.,* 288 U.S. 406 (1933); *Lovejoy v. Commissioner,* 18 B.T.A. 1179, 1182 (1930); *Simmons Co. v. Commissioner,* 8 B.T.A. 631 (1927), affd. 33 F.2d 75 (1st Cir. 1929); *Emerson Elec. Manufacturing Co. v. Commissioner,* 3 B.T.A. 932 (1926); *Buchholz Mortuaries, Inc. v. Commissioner,* T.C. Memo. 1990–269; see Rev. Rul. 86–67, 1986–1 C.B. 238; Rev. Rul. 81–160, 1981–1 C.B. 312; Rev. Rul. 75–172, 1975–1 C.B. 145; Rev. Rul. 70–360, 1970–2 C.B. 103; see also Rev. Rul. 71–191, 1971–1 C.B. 77.

vival), revg. 40 T.C. 379 (1963), was "bad law", and that the decisions in *Woodward v. Commissioner,* 397 U.S. 572 (1970) (disallowing deductions for legal, brokerage, and accounting fees incident to a redemption), and *United States v. Hilton Hotels Corp.,* 397 U.S. 580 (1970) (same), constituted "good law". However, the statute applies to *all* redemptions and "*any*" amount" incurred in connection therewith. Sec. 162(k)(1) (emphasis added). Petitioner acknowledges that this transcends simple clarification of the law concerning greenmail.

Section 162(k) did make the clarifications noted by petitioner. See S. Rept. 99–313, *supra* at 223 & n.3, 1986–3 C.B. (Vol. 3) at 223 (citing *Woodward v. Commissioner, supra*; and *United States v. Hilton Hotels Corp., supra*; *Five Star Manufacturing Co. v. Commissioner, supra*). However, the text of the statute and legislative history indicates that Congress intended more. Section 162(k) applies to deductions that are "otherwise allowable". This evidences an intent to override preexisting law.[19]

The phrase "in connection with" also suggests that Congress was at least as concerned with the breadth of the statute's application as it was with clarification. The conference report states:

> The conferees wish to clarify that, while the phrase "in connection with [a] redemption" is intended to be construed broadly, the provision is not intended to deny a deduction for otherwise deductible amounts paid in a transaction that has no nexus with the redemption other than being proximate in time or arising out of the same general circumstances. * * * [H. Conf. Rept. 99–841, *supra* at 168, 1986–3 C.B. (Vol. 4) at 168.]

The report goes on to provide several illustrative examples of the statute's scope. There is no mention in any of these examples of how prior law might have treated the expenses involved. Indeed, Congress explicitly considered the possibility that section 162(k) might be a change in the law:

> In denying a deduction for payments in connection with redemptions of stock, the committee intends no inference regarding the deductibility of

---

[19] If the statute's only purpose is to codify established law, the deductions to which it applies would not be "otherwise allowable". Thus, the use of those words in the statute would be meaningless. See *EEOC v. Commercial Office Prods. Co.,* 486 U.S. 107, 120–121 (1988) (interpretation of statutory language should not lead to "'absurd or futile'" results) (quoting *United States v. American Trucking Associations,* 310 U.S. 534, 543 (1940)).

such payments under present law. * * * [S. Rept. 99–313, *supra* at 224, 1986–3 C.B. (Vol. 3) at 224.]

Thus, we cannot say that Congress intended no change in the law where costs associated with redemptions are concerned.[20]

Nor can we agree that the general rule—allowing amortization of financing costs over the life of the loan—implies that such costs are not "in connection with" a redemption. This rule, and most of the cases and rulings cited by petitioner in support of it,[21] deal with whether financing costs should be capitalized as part of the cost of purchasing or constructing an asset, or as the cost of "creating" a loan. Under section 263, an expense is capitalized into the cost of a particular asset if it is incurred *"for"* that asset. Sec. 263(a)(1). It is this inquiry to which the cases and rulings cited by petitioner generally adhere.[22] See, e.g., *Anover*

---

[20] Petitioner makes numerous references to respondent's previous litigating positions regarding the effect of sec. 162(k) on prior law and the amortization of financing costs in general. Petitioner asserts that respondent has successfully argued in *Frederick Weisman Co. v. Commissioner*, 97 T.C. 563, 572 (1991), and *Stokely-Van Camp, Inc. v. United States*, 21 Cl. Ct. 731 (1990), affd. 974 F.2d 1319 (Fed. Cir. 1992), that sec. 162(k) did not change prior law and that respondent is judicially estopped from arguing otherwise now. We disagree. While respondent was successful overall in those cases, it is the adoption of the particular position at issue that carries significance for judicial estoppel purposes. *In re Cassidy*, 892 F.2d 637, 641 (7th Cir. 1990). In those cases, this Court and the Claims Court merely acknowledged that Congress intended no inference as to the state of the law prior to sec. 162(k). See *Frederick Weisman Co. v. Commissioner, supra* at 574; *Stokely-Van Camp, Inc. v. United States, supra* at 755; see also H. Conf. Rept. 99–841, at 168, 169 (1986), 1986–3 C.B. (Vol. 4) 1, 168, 169. They did not adopt respondent's contention that the legislation merely clarified prior law. Thus, judicial estoppel cannot apply here. *Huddleston v. Commissioner*, 100 T.C. 17, 28 (1993). Nor can it apply based on respondent's argument in *Buchholz Mortuaries, Inc. v. Commissioner, supra*, or the Government's argument in *INDOPCO, Inc. v. Commissioner*, 503 U.S. ___, 112 S. Ct. 1039 (1992), where sec. 162(k) was not at issue and was never mentioned. As a result, it is unnecessary to consider whether judicial estoppel would have applied if those courts had adopted respondent's position.

[21] We note that most of the cited cases base their decisions on the "primary purpose" test rejected in *Woodward v. Commissioner*, 397 U.S. 572 (1970), and *United States v. Hilton Hotels Corp.*, 397 U.S. 580 (1970), discussed *infra*.

[22] Petitioner directs our particular attention to those few cases using the phrase "in connection with". See, e.g., *Plaza Investment Co. v. Commissioner*, 5 T.C. 1295, 1297 (1945) ("The payment [of loan fees] was not an expenditure to acquire an income-producing asset, but an expense *in connection with* the creation of a liability." (Emphasis added.)). These cases, likewise, hold that financing costs are not expended "for", or "to acquire" a capital asset; they say nothing about whether financing costs are "in connection with" the resultant acquisition.

Petitioner also relies on Rev. Rul. 86–67, 1986–1 C.B. 238, 239, which states: "Expenses incurred to obtain a loan are distinguishable from expenses incurred *in connection with* the acquisition of an income-producing asset, such as a lease * * * they are expenses *in connection with* the creation of a liability." (Emphasis added.) We note that respondent's position in this ruling was formulated prior to the enactment of sec. 162(k). To the extent Rev. Rul. 86–67 is contrary to our understanding of the case law herein, it simply presents respondent's view of the issue. We are not bound by that view, *Braddock v. Commissioner*, 95 T.C. 639, 643 (1990), especially

*Realty Corp. v. Commissioner,* 33 T.C. 671, 675 (1960) ("The expenditure is not *for* the purpose of securing an asset" (emphasis added)).

The scope and language of section 162(k) contrasts sharply with that of section 263. Section 162(k) applies to a limited class of transactions (redemptions). Within that limited class of transactions, however, it is drafted to apply to a broad range of expenses, as illustrated in the Senate report (followed by the conference committee):

> The committee understands that some corporate taxpayers are taking the position that expenditures incurred to repurchase stock from stockholders to prevent a hostile takeover of the corporation by such shareholders—so-called "greenmail" payments—are deductible business expenses. The committee wishes to provide expressly that all expenditures by a corporation incurred in purchasing its own stock, whether representing direct consideration for the stock, a premium payment above the apparent stock value, *or costs incident to the purchase, are nonamortizable capital expenditures.* [S. Rept. 99–313, *supra* at 223, 1986–3 C.B. (Vol. 3) at 223; emphasis added.]

We construe the phrase "in connection with" in the manner prescribed by Congress and prior case law interpreting that phrase.[23] The cases cited by petitioner apply a different legal inquiry.

We respond similarly to petitioner's reliance on *Woodward v. Commissioner,* 397 U.S. 572 (1970), and *United States v. Hilton Hotels Corp.,* 397 U.S. 580 (1970). Petitioner contends that our interpretation of section 162(k) is essentially a reversion to the "primary purpose" test for expense characterization—a test that was rejected in *Woodward* and *Hilton.* Instead, petitioner urges us to utilize the "origin of the claim" test, which derives from the decision in *United States v. Gilmore,* 372 U.S. 39 (1963), and was adopted in *Woodward v. Commissioner,* 397 U.S. at 578. Petitioner argues that the "origin" of the financing costs is in the loan and debt transactions, which, under the latter test, would be

---

where, as here, respondent's position was formulated in a different context from the one at issue.

[23] Petitioner argues that this interpretation effects an "implied repeal" of a longstanding statutory tax rule, and as such, should be based on explicit instruction from Congress. See, e.g., *Blanco v. United States,* 775 F.2d 53, 61 (2d Cir. 1985). We disagree. Sec. 162(k) does not repeal any rule; it simply provides an exception to a general rule that remains intact. Moreover, Congress did provide explicitly for that exception by stating (in the statute) that sec. 162(k) applies to deductions "otherwise allowable".

regarded as separate from the redemption.[24] In *In re Kroy (Europe) Ltd.,* 27 F.3d at 369, the Court of Appeals for the Ninth Circuit relied heavily on identical reasoning to reach its conclusion.

The approach utilized by petitioner and the Court of Appeals for the Ninth Circuit assumes that the inquiry in this case is the same as that contemplated by the origin of the claim test.[25] We disagree. The origin test first arose out of a need to determine whether the expenses of defending a lawsuit were of a business or personal nature. See *United States v. Gilmore,* 372 U.S. 39, 43–44 (1963); *Commissioner v. Tellier,* 383 U.S. 687, 689 (1966); see also *Accardo v. Commissioner,* 942 F.2d 444 (7th Cir. 1991), affg. 94 T.C. 96 (1990); *Fischer v. United States,* 490 F.2d 218, 222 (7th Cir. 1973). It was expanded in *Woodward v. Commissioner, supra,* and *United States v. Hilton Hotels Corp., supra,* to deal with the question of whether such expenses were current or capital in nature.[26] See *Woodward v. Commissioner, supra* at 574; *United States v. Hilton Hotels Corp., supra* at 582; see also *Anchor Coupling Co. v. United States,* 427 F.2d 429, 433 (7th Cir. 1970). By contrast, there is no question that the financing costs at issue in this case are capital and business-related expenditures. *Goodwin v. Commissioner,* 75 T.C. 424, 440–441 (1980). This initial characterization and treatment of the expense will be the same regardless of our decision. The issue here is simply whether these financing costs were incurred "in connection with" the redemption within the meaning of section 162(k). The origin of the claim test provides no answer to this question.

In utilizing the origin test in *United States v. Gilmore, supra; Commissioner v. Tellier, supra; Woodward v. Commissioner, supra;* and *United States v. Hilton Hotels Corp., supra* the Supreme Court looked to the nature of the lawsuit at

---

[24] Neither *Woodward v. Commissioner, supra,* nor *United States v. Hilton Hotels Corp., supra,* dealt with or mentioned the tax treatment of financing costs.

[25] This may stem from the similar genesis of sec. 162(k) and the origin test, both of which were created in response to attempts by taxpayers to base deductibility of expenditures upon the *consequences* of incurring (or not incurring) such expenses. Compare *United States v. Gilmore,* 372 U.S. 39, 49 (1963) with S. Rept. 99–313 (1986), 1986–3 C.B. (Vol. 3) 1. As discussed, *infra,* we cannot allow this common theme to obscure the fact that the test adopted in sec. 162(k) is not the origin of the claim test.

[26] Indeed, we have found few cases that apply the origin test outside of the context of expenditures incurred during litigation. See, e.g., *Indiana Univ. Retirement Community Inc. v. Commissioner,* 92 T.C. at 897–898.

issue; i.e., the actions of the defendant involved in the suit, and the kind of transaction from which the claim arose. See *Entwicklungs und Finanzierungs A.G. v. Commissioner*, 68 T.C. 749, 759 (1977); *Boagni v. Commissioner*, 59 T.C. 708, 713 (1973). In essence, this Court looked to the raison d'etre for the suit, as distinguished from the consequences of defending (or failing to defend) the suit. See *Anchor Coupling Co. v. United States, supra* at 433.

The financing costs here correspond to the legal fees in the cited cases. The debt in this case is the analog to the lawsuits. Nevertheless, petitioner would have us end the analysis at this point. Petitioner argues that the origin of the financing costs is in its loan transaction and that we need look no further. This cannot be the end of the analysis. If it were, the Supreme Court in the cited cases would have ended its analysis by concluding that the legal fees originated in lawsuits. This would have told the Court nothing. Instead, the Court was forced to look further, to the origin and nature of the lawsuits. *Boagni v. Commissioner, supra* at 713.

If we were to apply the origin test here, we would also be forced to look further to the origin of the financing transaction. When we do so, we find that the loan transaction had its origin in the redemption plan. The financing originated in the planning stages of the redemption and nowhere else. At this point, however, the origin of the claim test breaks down. For the redemption was also a consequence of the financing. Thus, the origin test does not help to resolve this case. Nor should we expect it to. It was designed to make substantive distinctions between business and personal expenditures, or between current and capital expenditures. There are no such distinctions to be made here.

The appropriate test is found in the statute itself. It is an inquiry into whether the expenditures are "in connection with" the redemption.[27] It applies simply and clearly to the

---

[27] We do not believe that the references to *Woodward v. Commissioner*, 397 U.S. 572 (1970), and *United States v. Hilton Hotels Corp., supra*, in the legislative history are meant to imply a conclusion different from the one we reach. Both *Woodward* and *Hilton* are referenced in the "Present Law" (i.e., pre-1986 law) sections of the House and Senate reports. Sec. 162(k), as discussed above, uses language that is broader in scope than that used by the cited (pre-1986) cases and sec. 263. Moreover, *Woodward* and *Hilton* are cited in the legislative history only for the limited proposition that certain acquisition expenses are to be capitalized. They are not cited as models for legal analysis under sec. 162(k). Thus, their relevance to our current inquiry is minimal. The primary purpose test, as well as the "origin" test urged upon us by petitioner,

issue at hand. We see no reason to engage in difficult alternative lines of inquiry when the test provided in the statute is so readily applicable. Contrary to petitioner's arguments, and those of the Court of Appeals in *In re Kroy (Europe) Ltd.,* see 27 F.3d at 370, our interpretation is not a reversion to the "primary purpose" test or a rejection of the origin test, but rather a common sense application of the specific test provided in the statute.[28]

Petitioner next attempts to classify its procurement of financing as a transaction having "no nexus with the redemption other than" its temporal and circumstantial proximity. Petitioner cites the conference report, which states:

> The conferees wish to clarify that, while the phrase "in connection with [a] redemption" is intended to be construed broadly, the provision is not intended to deny a deduction for otherwise deductible amounts paid in a transaction that has no nexus with the redemption other than being proximate in time or arising out of the same general circumstances. * * * [H. Conf. Rept. 99–841, *supra* at 168, 1986–3 C.B. (Vol. 4) at 168.]

In order to make this argument, however, petitioner relies on the case law regarding capitalization of financing costs. We have already determined that case law to be inapposite under section 162(k). Moreover, on a factual basis, we think it somewhat disingenuous to say that the financing in this case had no nexus with the redemption. Rather, it was absolutely necessary to the redemption.[29] Instead of arising

---

are simply inapposite under sec. 162(k), where the test—stated clearly in the statute—is whether expenses are "in connection with" a redemption.

[28] Petitioner contends that a distinction between financing costs (which should be amortized over the life of debt) and other capital expenditures (which are added to the asset's cost and amortized over its life if possible) is sound tax policy because borrowing costs do not add value to any asset, whereas other capital expenditures do add value. We disagree. Sec. 162(k) simply does not comport with a legal inquiry based on "value enhancement". In an economic sense, the costs listed in the legislative history (legal, brokerage, and accounting fees) add no value to an asset. Thus, under petitioner's theory, they should not be capitalized into the asset's cost. Despite this, the statute clearly requires such treatment in contravention of petitioner's theory. Indeed, it is arguable whether stock repurchased in a redemption has any basis (i.e., cost) into which such expenses could be capitalized. Cf. Rev. Rul. 74–503, 1974–2 C.B. 117; Banoff, "How IRS' new zero-basis approach will affect corporate tax planning", 42 J. Taxn. 96 (1975).

Petitioner also argues that our interpretation would require the tracing of cash used in a redemption to determine its source for nondeductibility purposes. Petitioner contends that this is a "dispute-intensive proposition" which, as a tax policy matter, should be disfavored. We are not as certain that such tracing will be required under our interpretation. In any event, the "in connection with" inquiry is inherently fact intensive. See *Centel Communications Co. v. Commissioner,* 920 F.2d 1335, 1341 n.6, 1342 (7th Cir. 1990), affg. on this issue 92 T.C. 612 (1989).

[29] In its argument on brief concerning a related issue, petitioner stated: "The uncontroverted

out of the same general circumstances, the financing in this case arose solely because of the redemption. As examples of transactions arising out of the same general circumstances (but not in connection with), the conference report describes a payment to a departing employee (whose stock is also redeemed) in discharge of the corporation's obligations under an employment contract. Other examples include:

Payments in discharge of other types of contractual obligations, in settlement of litigation, or pursuant to other actual or potential legal obligations or rights, may also be outside the intended scope of the provision to the extent it is clearly established that the payment does not represent consideration for the stock *or expenses related to its acquisition* * * *. [H. Conf. Rept. 99–841, *supra* at 169, 1986–3 C.B. (Vol. 4) at 169; emphasis added.]

By contrast, petitioner's financing costs were expenses directly related to the acquisition of its stock, as we have found above. Thus, we reject petitioner's argument that such costs have no nexus with the redemption.

Petitioner next argues that, structurally, the statute is organized to suggest that financing costs were not considered to be in connection with a redemption. For this argument, petitioner relies on the placement of the interest exception within subparagraph (A) of paragraph (2). The two exceptions listed in that subparagraph, according to petitioner, are of a kind; namely, deductions for amounts potentially characterizable as actual consideration for stock. According to petitioner, the exception in subparagraph (B), on the other hand, relates to incidental expenses (defined not to include financing costs) but only when paid or incurred *in connection with the redemption of any stock in certain regulated investment companies*. Under this theory, the statute contemplates interest—a financing cost—only as a potential payment in consideration for stock, not as an expense "in connection with" a redemption. From this, petitioner concludes that other financing costs, such as those at issue, are also not in connection with a redemption.

Petitioner's theory is mere speculation. In the absence of legislative guidance, we cannot say for certain why section 162(k)(2) groups the exceptions as it does. At bottom, however, this argument simply returns us to the phrase "in

---

trial testimony establishes * * * [that] Petitioner would not have been able to effect its stock acquisition transaction without Morgan Stanley's purchase of $533 million of bridge notes".

connection with". We have already decided that it should be interpreted broadly. A speculative theory regarding the statute's structure is not enough to convince us otherwise.

Petitioner argues that our interpretation is insupportable because it "[indicates] a purported breadth of I.R.C. § 162(k) that would include not only the costs related to obtaining funds through borrowing, but also costs of obtaining funds used in a redemption through sales of assets, operating cash flows, etc." Petitioner's argument attributes a purely legalistic modus operandi to the "in connection with" inquiry. That inquiry, by contrast, has always been a factual one. *Centel Communications Co. v. Commissioner*, 920 F.2d 1335, 1341 n.6, 1342 (7th Cir. 1990), affg. 92 T.C. 612 (1989). Thus, the statute's "purported breadth" will be limited to those circumstances indicating an actual factual relationship between the expenditure and the redemption.[30]

We need not address petitioner's fear that section 162(k) might be extended to the costs of asset sales, the proceeds of which are used to fund a redemption. We note however, that, in such cases, the factual relationship between the redemption and the cost at issue would be significantly more attenuated than the connection we address today. For our purposes, it is enough to decide that, on the facts of this case, petitioner's financing costs were incurred in connection with its redemption. As with most debt, petitioner was expressly required by each lender and debt purchaser to use the proceeds for a clearly specified purpose—the redemption, the refinancing of the bridge loan, and other refinancings brought about solely due to the redemption. The purchasers and lenders specifically conditioned their loans and debt purchases. Had the redemption not taken place, no loans would have been forthcoming. In the case of most asset sales, on the other hand, the purchaser would have no reason to condition the seller's use of the proceeds upon anything. A seller of assets would have full discretion to use the proceeds for a redemption or for any other purpose. Petitioner was given no such latitude.

---

[30] The conference report provides additional guidelines for limiting the scope of the statutory inquiry by conferring some protection on "Payments in discharge of * * * contractual obligations, in settlement of litigation, or pursuant to other actual or potential legal obligations or rights". [H. Conf. Rept. 99–841, *supra* at 169, 1986–3 C.B. (Vol. 4) at 169.]

Petitioner also argues that the revenue estimates for section 162(k) provide evidence of its intended scope. The minimal level of those estimates, according to petitioner, indicates the appropriateness of a less expansive interpretation for the section. We place little faith in the interpretative value of these estimates. Petitioner cites, and we have found, no case which uses such estimates as a factor in its interpretation of a statute.[31] The legislative history provides no explanation for the numbers reached, nor does it state the assumptions on which they are based.

Petitioner next contends that, even if the financing costs of its bridge loans are subject to section 162(k), the financing costs associated with its issuance of permanent debt on November 1, 1988, are not "in connection with" its LBO. The facts, however, contradict this contention. Donald P. Brennan, head of Morgan Stanley's merchant banking division, stated that the permanent debt was "part of the plan" of the redemption. On April 6, 1988, at the very first stage of planning, Morgan Stanley proposed a tentative timetable for the LBO including—as the final step—a refinancing with permanent debt. On June 28, 1988, Bankers Trust distributed a confidential document to various banks encouraging them to join in the banking syndicate. That document assumed that the bridge loans would be refinanced *at the date of the merger.*[32] In July of 1988, Mr. Brennan contacted Dillon, Read & Co., regarding the possibility that Dillon, Read & Co. would act as qualified independent underwriter of permanent financing. The drafting of the preliminary prospectus for the public offering of permanent financing began at that time as well. Morgan Stanley issued a letter dated August 8, 1988, stating that it was "highly confident" of its ability to underwrite the permanent financing at market rates in an amount at least sufficient to repay the $400 million of bank bridge loans under the credit agreement. Indeed, on June 25, 1988, over 1 month prior to the initiation of the tender offer, the institutional investors had committed to purchase permanent

---

[31] In *United States v. Carlton*, 512 U.S. ___, 114 S. Ct. 2018 (1994), an erroneously low estimated revenue loss was indicative of a "mistake" that justified the retroactivity of subsequent corrective legislation. However, the "mistake" had no apparent impact on the interpretation of the original statute.

[32] In exposing this assumption, the document states: "Practically, the merger and the refinancing will probably not occur simultaneously but the above presentation demonstrates the expected back-end capital structure."

financing securities of $95 million. On August 1, 1988—still 7 days before the close of the tender offer—FH Holdings, FH Acquisition, and the investors executed a securities purchase agreement, in which the investors made commitments to purchase bridge and permanent financing.

The confidential offering memorandum for the bridge notes, dated July 1988, is even more explicit. It states:

Because the Acquisition is expected to close prior to the time that the Permanent Financing will be issued, the financing *necessary* to complete the Acquisition will be provided in two stages. * * * In the second stage of the financing, the Bridge Notes will be *refinanced* out of the proceeds of the issuance of the Permanent Financing. [Emphasis added.]

Thus, according to this document, the permanent financing was not only in connection with the redemption, but "necessary" to it as well.

In actuality, just 8 days separated the completion of the "redemption" and the issuance of the permanent financing. The tender offer for Fort Howard stock by FH Acquisition closed on August 8, 1988. The term and bridge loans were utilized on that date as well. On October 24, 1988, FH Holdings was merged into FH Acquisition. FH Acquisition survived the merger and was immediately merged with and into petitioner. And, on November 1, 1988, the permanent financing was issued and used to pay in full the bank bridge loan and all the subordinated floating-rate bridge notes.

On these facts, we find that the issuance of permanent financing on November 1, 1988, was clearly "in connection with" the redemption here at issue. The permanent debt was a refinancing of the bridge debt and term loans used to redeem petitioner's shares in the tender offer. The credit agreement labels it as such and *requires* petitioner to issue refinanced permanent debt within 13 months.[33] In *Huntsman v. Commissioner,* 905 F.2d 1182, 1184–1185 (8th Cir. 1990), revg. and remanding 91 T.C. 917 (1988), the Court of Appeals for the Eighth Circuit found that the refinancing of the taxpayer's residence was "in connection with" the original

---

[33] While this was required only with respect to the $400 million bank bridge loans, the securities purchase agreement evidences an intention to replace the bridge notes held by the signatories thereto for permanent debt. Moreover, regardless of the amount involved, the credit agreement serves as evidence that the issuance of permanent debt was part of petitioner's overall plan. Indeed, *all* the major documents produced by Morgan Stanley with regard to the LBO contemplate a "refinancing" of the bridge notes with permanent debt.

purchase because it "was merely an integrated step in securing the permanent financing". In *Huntsman,* the taxpayer purchased a principal residence in January 1981. The residence was partly financed by a 3-year balloon loan, secured by a mortgage on the property. The note was payable in monthly installments with the balance due in January 1984. On September 16, 1983, a few months prior to the maturity date of the loan, the taxpayers refinanced with a 30-year loan, paying off the balloon note and a second note. As part of the refinancing, the taxpayers paid points and deducted those points pursuant to section 461(g)(2), which permits a deduction for points paid in respect of any indebtedness incurred "in connection with" the purchase or improvement of a principal residence. The Court of Appeals for the Eighth Circuit held that the phrase "in connection with" should be "broadly construed" and that "Acquiring the permanent mortgage was done to extinguish the short-term loans and finalize the purchase of the home." *Huntsman v. Commissioner,* 905 F.2d at 1185.

Petitioner's primary argument in this regard is simply that the successful issuance of the permanent financing was never certain because of the risk involved. However, this does not obscure the fact that the issuance of such financing was part of the merger plan from before the time such plan was adopted by petitioner's board. Moreover, regardless of any uncertainty, the permanent financing was indeed issued. As in *Huntsman v. Commissioner, supra,* it was issued to extinguish the short-term loans and finalize the financing for the redemption.

In *Huntsman v. Commissioner, supra,* a majority of this Court held that the refinancing of the taxpayers' home was *not* in connection with the purchase. However, the majority's decision states:

> We do not herein decide that all types of refinancing of a principal residence fall outside the exception of sec. 461(g)(2). An example may be the building of a residence with a construction loan replaced upon completion with a permanent mortgage loan. Another example may be a "bridge" loan, depending upon the circumstances. * * * [*Huntsman v. Commissioner,* 91 T.C. at 920 n.5.]

Both of these scenarios are represented in this case. The buyout group planned from the start to replace the bridge

debt with the permanent debt upon completion of the redemption. Moreover, the period between purchase and refinancing in *Huntsman v. Commissioner, supra* (over 2½ years) was substantially longer than the period here. Therefore, this case does not present an occasion to reconsider our opinion in *Huntsman v. Commissioner, supra.*

Finally, petitioner contends that *Esmark, Inc. & Affiliated Cos. v. Commissioner,* 90 T.C. 171 (1988), affd. without published opinion 886 F.2d 1318 (7th Cir. 1989), and similar cases support its argument. In *Esmark,* this Court refused to apply the "step-transaction doctrine" to disregard the first part (the "tender offer") of a two-step acquisition despite the fact that the two steps were part of an overall plan. Again, petitioner's argument obscures the significance of the "in connection with" inquiry. The step transaction doctrine is aimed at determining whether one of several steps in a transaction is "individually meaningless". *Esmark, Inc. & Affiliated Cos. v. Commissioner, supra* at 195. The "in connection with" inquiry is broader, focusing on whether steps in a transaction have a common "nexus" or are "related". See H. Conf. Rept. 99–841, *supra* at 168–169, 1986–3 C.B. (Vol. 4) at 168–169. While the presence of steps in a single plan may prove little about the independent significance of such steps, it is conspicuous evidence of a common nexus and relation between them. We have made our inquiry and find that a nexus and relation is clearly present between the "redemption" in this case and the permanent financing.[34]

This concludes the legal analysis in this case as presented by the parties and as addressed by the Court of Appeals in *In re Kroy (Europe) Ltd., supra.* Additional analysis is warranted, however, in order to fully explain the application of section 162(k) to amortization deductions for the costs here at issue. The statute disallows deductions for "any amount paid or incurred". Sec. 162(k)(1). Does amortization constitute an amount paid or incurred? We answer this question in the affirmative.

---

[34] We note that petitioner's own argument in this case supports our conclusion. In that argument, petitioner contends that $26.2 million of the $40 million transaction fee paid to Morgan Stanley was interest. To prove this, petitioner relies on the allocation of part of this lump-sum fee to the permanent financing, suggesting a connection between the two integrated financings herein.

Section 162(k) was designed to provide that costs in connection with a redemption are *"nonamortizable* capital expenditures." S. Rept. 99–313, *supra* at 223, 1986–3 C.B. (Vol. 3) at 223 (emphasis added); H. Rept. 99–426, at 248 (1986), 1986–3 C.B. (Vol. 2) 1, 248 (emphasis added). In explicitly prohibiting amortization, the legislative history suggests that amortization was considered an "amount paid" by Congress.[35]

The case law supports this conclusion. In *Commissioner v. Idaho Power Co.,* 418 U.S. 1 (1974), the Supreme Court explored whether construction equipment depreciation constituted an "amount paid out" as a capital expenditure in constructing a capital asset for purposes of section 263(a)(1). The Court stated:

> There is no question that the cost of the transportation equipment was "paid out" in the same manner as the cost of supplies, materials, and other equipment, and the wages of construction workers. * * * In acquiring the transportation equipment, taxpayer "paid out" the equipment's purchase price; depreciation is simply the means of allocating the payment over the various accounting periods affected. As the Tax Court stated in *Brooks v. Commissioner,* 50 T.C., at 935, "depreciation—inasmuch as it represents a using up of capital—is as much an 'expenditure' as the using up of labor or other items of direct cost." [*Id.* at 16–17; fn. ref. omitted.]

For tax purposes, amortization serves a purpose similar, if not identical, to depreciation. See *Arkansas-Oklahoma Gas Co. v. Commissioner,* 201 F.2d 98, 102 (8th Cir. 1953), revg. 17 T.C. 1208 (1952); Black's Law Dictionary 76, 397 (5th ed. 1979) (definitions of "amortization" and "depreciation"). Moreover, while the expenditures and transactions to which sections 162(k) and 263 apply may be different, the aims of the two sections are analogous. Both prohibit current deductions and characterize the expenses to which they apply as capital. In light of these similarities and the decision in *Idaho Power,* we see no way to avoid characterizing the amortization deductions here at issue as "amounts paid or incurred".[36]

---

[35] The explicit provision for nonamortization in the legislative history lends support to our conclusion that financing costs, which would be otherwise allowable as amortization deductions, should be considered "in connection with" a redemption.

[36] We note, as did the Supreme Court, see *Commissioner v. Idaho Power Co.,* 418 U.S. 1, 16 n.11 (1974), that depreciation has been held not to be an expenditure or payment for purposes of a charitable contribution deduction under sec. 170, see *Orr v. United States,* 343 F.2d 553 (5th Cir. 1965), or for purposes of a medical expense deduction under sec. 213, see *Gordon v.*

This treatment comports with the congressional intent to treat costs in connection with a corporation's purchase of its own stock as capital expenditures. S. Rept. 99–313, *supra* at 223, 1986–3 C.B. (Vol. 3) at 223; H. Rept. 99–426, *supra* at 248, 1986–3 C.B. (Vol. 2) at 248. "[S]tock is most naturally viewed as a capital asset". *Arkansas Best Corp. v. Commissioner*, 485 U.S. 212, 222–223 (1988). Costs capitalized as part of the purchase price of stock are not amortizable as a matter of general tax law. *Barbour Coal Co. v. Commissioner*, 74 F.2d 163 (10th Cir. 1934), affg. a Memorandum Opinion of this Court; *Skaggs Cos. v. Commissioner*, 59 T.C. 201, 207 (1972). Section 162(k) ostensibly implements an alternative capitalization scheme for expenses incurred "in connection with" particular stock purchases. Therefore, it is only logical that the prohibition on amortization should be extended to expenses covered by that scheme. If we were to characterize amortization deductions as something other than amounts paid or incurred, they would arguably be deductible under the plain language of section 162(k). This would thwart the purpose of the statute.

The final issue for decision is whether portions of the $40 million fee paid to Morgan Stanley should be characterized as interest deductible under section 163, which is excepted from the general rule under section 162(k). On its 1988 Form 1120, petitioner treated $36 million of the $40 million paid to Morgan Stanley as a cost of obtaining the financing for its LBO. Petitioner allocated this $36 million on a pro rata basis over all the various kinds of loans and debt issued in the transaction.[37] Respondent does not challenge this allocation.

By amendment to petition, petitioner contended (and continues to contend) that the $40 million payment should be allocated as follows: (1) $26.2 million as additional interest on the bridge financing, which would be fully deductible in

---

*Commissioner*, 37 T.C. 986 (1962). In distinguishing those decisions, the Supreme Court stated:

Section 263 is concerned, however, with the capital nature of an expenditure and not with its timing, as are the phrases "payment * * * within the taxable year" or "paid during the taxable year," respectively used in §§170 and 213. The treatment of depreciation under those sections has no relevance to the issue of capitalization here. * * * [*Commissioner v. Idaho Power Co.*, *supra* at 16–17 n.11.]

That rationale applies to our analysis herein. Sec. 162(k), like sec. 263, is concerned with the capital nature of an expenditure. S. Rept. 99–313, *supra*, 1986–3 C.B. (Vol. 3) 1; H. Rept. 99–426, *supra*, 1986–3 C.B. (Vol. 2) 1.

[37] See *supra* note 9.

1988 due to retirement of such financing in that year; (2) $12.42 million as pro rata costs of issuing or obtaining all the various loans and debt issuances (including the permanent financing) used to finance the LBO; and (3) $1.38 million as nondeductible costs of obtaining equity financing.

As to those portions agreed by petitioner to be costs of obtaining debt financing, we have already decided that such costs were incurred in connection with the redemption and are neither deductible nor amortizable due to section 162(k). As noted, petitioner does not contest the nondeductibility of those portions of the fee agreed to be costs of obtaining equity financing. Thus, we need only decide whether the $26.2 million portion of the fee constituted additional interest on the bridge financing. In making this inquiry, we look to all the facts and circumstances and not mere terminology. See *Duffy v. United States,* 231 Ct. Cl. 679, 690 F.2d 889, 897 (1982); *Wilkerson v. Commissioner,* 70 T.C. 240, 253 (1978), revd. on other grounds 655 F.2d 980 (9th Cir. 1981). Petitioner bears the burden of proof. Rule 142(a); *Welch v. Helvering,* 290 U.S. 111 (1933).

"Interest" is "the amount which one has contracted to pay for the use of borrowed money." *Old Colony R.R. Co. v. Commissioner,* 284 U.S. 552, 560 (1932). Interest is also commonly defined as "compensation for the use or forbearance of money." *Deputy v. du Pont,* 308 U.S. 488, 498 (1940). Interest is the equivalent of "rent" for the use of funds. *Dickman v. Commissioner,* 465 U.S. 330, 339 (1984).

In contrast to these definitions, at the time of the LBO, all the parties involved intended, agreed, and believed that the fee was compensation for services. First, we note that petitioner paid amounts—other than the $40 million at issue—that were specifically designated as "additional interest". At trial, Mr. Donald P. Brennan, head of merchant banking at Morgan Stanley and later a director of petitioner, was asked whether the points and interest (exclusive of the $40 million) paid to Morgan Stanley were sufficient to compensate the firm for its risk in committing to purchase the amount of bridge notes ($793 million). Mr. Brennan replied that "at the time it appeared to be" but that "in hindsight" it did not. The proxy statement issued to the stockholders for the purpose of approving the merger of FH Acquisition into Fort Howard indicates that Morgan Stanley acted as financial adviser to

FH Acquisition and as dealer/manager for the tender offer, and that, as "compensation for such services", Morgan Stanley was paid a "transaction fee" of $40 million. Mr. Brennan agreed that this description was correct at the time the proxy statement was written. On October 25, 1988, petitioner filed the prospectus for the subordinated notes and debentures with the SEC. The prospectus states that Morgan Stanley received a financial advisory fee of approximately $40 million in connection with the acquisition. Mr. Brennan, who was a director of petitioner at the time the prospectus was filed, agreed that the description of the $40 million transaction fee was correct at the time. Petitioner's Form 10–K for the year 1988, filed with the SEC, contains an identical description of the $40 million transaction fee. Ms. Kathleen J. Hempel, a director and principal financial officer of petitioner, agreed that this description was correct at the time it was filed. She testified that she would have been "very concerned" if the description had been inaccurate. Ms. Hempel also approved the allocation of the $40 million fee on petitioner's tax return for 1988. At the time of her approval, she did not believe that any of the $40 million was interest.

All the documentary evidence unambiguously treats the payment in question as a fee for services, and petitioner treated the payment as a cost of obtaining the financing rather than as interest on its 1988 return. Petitioner first agreed to pay the $40 million in a letter executed to "confirm the arrangements under which * * * [Morgan Stanley] is engaged on an exclusive basis by FH Acquisition Corp., * * * in connection with a possible acquisition * * * of Fort Howard Corporation". In the letter, dated June 25, 1988, the payment was characterized as a "transaction fee", "In the event that [FH Acquisition] consummates an Acquisition Transaction". The letter was written by Morgan Stanley and signed by a representative of FH Acquisition. It stated:

This letter is to confirm our understanding with you with respect to our engagement. In connection with this assignment, you and we have agreed that Morgan Stanley will *assist* * * * [FH Acquisition] in its preparation and structuring of the Acquisition Transaction and provide whatever *financial advice* and *assistance* may be required in connection therewith. [Emphasis added.]

In the letter, FH Acquisition agreed

to retain Morgan Stanley as sole dealer manager for the Offer and to enter into a dealer manager agreement with Morgan Stanley in Morgan Stanley's standard form, but not providing for the payment of any fees other than those provided for in this letter agreement. * * *

Thus, according to the letter, the parties contemplated that this would be the only "fee" that Morgan Stanley would receive for its services in organizing the LBO.[38]

On July 1, 1988, FH Acquisition sent a formal letter to Morgan Stanley by which it engaged Morgan Stanley as "Dealer Manager" for the tender offer. That letter stated in pertinent part:

2. [FH] Acquisition hereby engages you as financial advisor and appoints you as Dealer Manager and authorize[s] you to act as such in connection with the Offer. As Dealer Manager, you agree, in accordance with your customary practice, to perform those services in connection with the Offer as are customarily performed by investment banking concerns in connection with tender offers of like nature, including but not limited to soliciting Shares sought to be purchased by [FH] Acquisition pursuant to the Offer.

\* \* \* \* \* \* \*

5. [FH] Acquisition and you agree that your services as financial advisor and the Dealer Manager hereunder are to be compensated *as a component of the fee for your financial advisory services to [FH] Acquisition contemplated by the letter agreement between you and [FH] Acquisition, dated as of June 24, 1988*. [Emphasis added.[39]]

Morgan Stanley billed FH Acquisition for the $40 million fee on August 8, 1988, by an invoice that described the payment as follows: "For *Financial Advisory Services* rendered in organizing the financing required for the purchase of all the outstanding common shares of Fort Howard Corporation by FH Acquisition Corp." Morgan Stanley's internal documents all describe the $40 million fee as an "organizer fee". FH Acquisition paid the $40 million along with other "fees" listed in the same invoice, on August 9, 1988. Morgan Stanley's internal documents used to determine the feasibility of the tender offer and debt issuances all list the payment as an "organizer fee".

---

[38] It was also agreed that petitioner would reimburse Morgan Stanley for its costs (e.g., printing, legal, and transportation) incurred in rendering its services.

[39] There is no letter of June 24, 1988, in the record. It appears that this reference corresponds to Morgan Stanley's letter of June 25, 1988, discussed *supra*.

The magnitude of the fee is not out of line with the size of the transaction and the extent of Morgan Stanley's services. At the time, petitioner's LBO was one of the largest on record and was the largest in which Morgan Stanley had been involved. Morgan Stanley played a substantial role in getting the commitment from the five lead banks and in selling the LBO as a credit risk to the remaining banks in the bank syndicate. It also acted as financial adviser and dealer manager for all stages of the LBO. Petitioner points to testimony that Morgan Stanley's fee schedule in effect at the time for mergers and acquisitions would have called for a fee of $13.8 million on a transaction the size of petitioner's without any commitment of funds by Morgan Stanley. From this, petitioner concludes that $26.2 million ($40 million less $13.8 million) must have been "compensation for the use of money."

The LBO was performed by Morgan Stanley's merchant banking department, which used a different fee schedule from the mergers and acquisitions department. Moreover, Mr. Brennan testified that it was not possible to compare a scenario in which Morgan Stanley committed capital to one in which it did not. According to testimony from Mr. Brennan and Mr. Robert H. Niehaus, another principal of Morgan Stanley, the fee schedule used by the merchant banking department in 1988 indicated a fee of approximately 1 percent for a transaction of $4 billion, which was the size of petitioner's LBO. This correlates perfectly to the fee of $40 million actually charged by Morgan Stanley.

Petitioner's primary arguments in this regard focus on Morgan Stanley. Petitioner contends that Morgan Stanley has an average (or target) return on its equity capital, which Morgan Stanley utilizes (along with the risk involved) in determining whether to commit funds to a particular investment. Petitioner argues that, in this case, if the $40 million was not interest, Morgan Stanley would have been committing capital to an investment (the bridge notes) with a very high risk at a rate whose yield was potentially below the firm's target return at the time. Essentially, petitioner asks us to determine the characterization of the amount at issue based on what would have been a "good" investment for Morgan Stanley.

Implicit in petitioner's argument (and those of its experts) is the assumption that all amounts paid as compensation for risk constitute interest. We disagree. As respondent correctly points out, a commitment fee compensates a lender for its risk in committing to make a loan, but nevertheless, does not constitute interest. Cf. *Kovtun v. Commissioner*, 54 T.C. 331, 338 (1970), affd. 448 F.2d 1268 (9th Cir. 1971).

Moreover, the established definitions of interest are not concerned with whether a lender receives a return commensurate with its usual return.[40] Indeed, this Court has stated that, in analyzing whether a payment constitutes interest or a service fee, "arguments focusing on the lender's costs appear to deal with the wrong party so far as the borrowers are concerned". *Wilkerson v. Commissioner*, 70 T.C. at 256. Here, the borrower's tax treatment is at issue. Thus, we find petitioner's arguments regarding Morgan Stanley's risk and required return somewhat beside the point.

Crucial in establishing whether a particular payment constitutes interest is whether the payment bears some relationship to the amount borrowed, or to the specific time period for which payment is designated.[41] *Sharp v. Commissioner*, 75 T.C. 21, 32 (1980), affd. 689 F.2d 87 (6th Cir. 1982); *Lay v. Commissioner*, 69 T.C. 421, 438 (1977). No such relationship is evidenced in the record before us. Petitioner's payment of the $40 million fee was contingent only upon successful completion of the tender offer. Morgan Stanley was to receive its $40 million fee regardless of the dollar amount of bridge notes purchased by it, as long as it had arranged for sufficient financing to purchase all the tendered shares. Mr. Brennan stated at trial that the amount of the fee was not in any way dependent upon the relative percentages of debt and equity that were going to be used to purchase petitioner's stock. He also confirmed that the amount of the fee was simply calculated as 1 percent of the *total* transaction, which was worth $4 billion in the aggregate. Thus, the $40 million was simply reflective of the total size of the LBO, rather than any particular debt amount pur-

---

[40] Even the provisions that impute interest on certain principal payments, e.g., secs. 483(b) and 1274(b)(2), do so based on the "applicable Federal rate" rather than the rate which is adequate for a particular investor.

[41] We note that petitioner's reliance on the purported fee schedule discussed above establishes no such relationship.

chased by Morgan Stanley[42] and cannot be defined as "compensation [paid] for the use or forbearance of money." *Deputy v. du Pont,* 308 U.S. at 498.

Moreover, the payment was not dependent in any way upon the term of the financing. The bridge notes had stated terms of approximately 13 months and provisions allowing conversion to long-term "rollover debentures" due September 15, 2004. The bridge notes were actually outstanding for less than 3 months. Yet, the $40 million was payable up front, without any reference to the term—stated or actual—of the notes. This is strong evidence that the payment did not constitute compensation for the use or forbearance of money.[43] *Deputy v. du Pont, supra.* Moreover, Mr. Niehaus testified that Morgan Stanley's management committee would probably not have approved the bridge loan investment "in the absence of some indication from the fixed income department that they were reasonably confident of syndicating the bridge loan". Indeed, on August 9, 1988, the same date the bridge notes were issued by petitioner, Morgan Stanley had executed contracts to make secondary sales of all but $75 million of the bridge notes it purchased. Morgan Stanley closed on these secondary sales and participations between August 11 and August 15, 1988, a maximum of 6 days after it purchased the bridge notes.

---

[42] Petitioner's expert, Mr. Paul J. Much, confirmed at trial that the $40 million was "not a function of an amount of money that Morgan Stanley put in" to the deal.

[43] In the same vein, the rates and amounts of interest, which would have resulted had the $26.2 million been interest to Morgan Stanley, appear excessive. If the $26.2 million were interest, the effective interest rate on the $533 million in bridge notes held by Morgan Stanley would be 31.9 percent, based upon the assumption that they would be outstanding for 3 months, and 22.7 percent, based upon the assumption that they would be outstanding for 6 months. Petitioner objects to this finding on the grounds that it assumes that the notes would indeed be refinanced as intended. Petitioner contends that at the time the bridge notes were issued, there was a possibility that a refinancing would not be possible due to any number of hypothetical factors. Petitioner does not dispute the calculations, however. Moreover, petitioner's own expert (upon whose testimony petitioner primarily relies for the instant argument) noted that Morgan Stanley, itself, made the same assumption in issuing the bridge notes. The notes were actually outstanding for less than 3 months and, as noted in the text, within 2 days, Morgan Stanley had sold participations in or made outright sales of most of the bridge notes.

While the bridge loan and bridge notes from the bank syndicate are not precisely analogous, a rough comparison of their terms also yields an inference that an additional $26.2 million in interest on the bridge notes would be excessive. The bridge loan amount was $400 million, as compared to $533 million in bridge notes held by Morgan Stanley. The stated rate of interest on the loan was the U.S. "prime" rate + 2 percent (subsequently reduced by .50 percent due to the issuance of the "highly confident" letter by Morgan Stanley). On the notes, the stated rate was based on the London Interbank Offering Rate (LIBOR), and ranged from LIBOR + 3.5 percent to LIBOR + 8.0 percent. Petitioner paid additional interest on the loan of $6,666,667 and on the bridge notes held by Morgan Stanley of $10,660,000.

Petitioner's attempts to use experts to support its characterization of the fee are simply restatements of its argument that the return received by Morgan Stanley would have been inadequate had the fee not constituted interest. These arguments ignore the fact that Morgan Stanley still received the same amount of money, whether it is characterized as interest or as a transaction fee. Mr. Charles B. Hintz, Morgan Stanley's treasurer, testified that—as to Morgan Stanley's analysis of whether it received an adequate return on its capital—the characterization of the $40 million as interest or service fee was irrelevant. Thus, we can infer nothing from petitioner's arguments regarding the return required by Morgan Stanley for its investment.

Petitioner agrees that some of the fee paid to Morgan Stanley constituted a payment for services. The question at issue, therefore, is how much. We must look to the actual evidence and testimony, rather than a theoretical model of risk and return, to make that determination. See *Wilkerson v. Commissioner,* 70 T.C. at 255–256. After doing so, we find petitioner's arguments unconvincing on both a factual and logical basis. We conclude that the $26.2 million was a payment for services and not deductible under section 163 for purposes of section 162(k).

*An appropriate order will be issued.*

Reviewed by the Court.

HAMBLEN, CHABOT, PARKER, SWIFT, JACOBS, GERBER, WRIGHT, WELLS, WHALEN, COLVIN, CHIECHI, and LARO, *JJ.,* agree with this majority opinion.

---

HALPERN *J.,* dissenting: In its long opinion, the majority spends little if any effort to determine Congress' reasons for adding the rule found in section 162(k). Having failed to do so, it is unable to test its result against such reasons. Its analysis is, thus, less than fully satisfying. Congress appears to have been concerned with taxpayer attempts to move the capital-ordinary boundary in the universe of stock redemptions. See H. Rept. 99–426 (1986), 1986–3 C.B. (Vol. 2) 1, 248; S. Rept. 99–313 (1986), 1986–3 C.B. (Vol. 3) 1, 222; H. Conf. Rept. 99–841 (1986), 1986–3 C.B. (Vol. 4) 1, 168. It is

not clear to me that Congress decided to deal with that attempt by adopting a scorched earth policy (which is the way I read the majority's opinion). Judge Beghe's inquiry appears to me to lead to a more satisfying approach to the problem. Therefore, I join Judge Beghe.

BEGHE, *J.,* agrees with this dissent.

---

BEGHE, *J.,* dissenting: The easy path would have been to go along with the majority's conclusion in this case. That could have been justified by the considerations that actuated Judge Reinhardt's special concurrence in *In re Kroy (Europe) Ltd.,* 27 F.3d 367, 370 (9th Cir. 1994), which, of course, reached the contrary result:

> This is a close question. I cannot say that the conclusion reached in Judge McLaughlin's [Ruwe's] opinion is incorrect. If Congress intended a different result, it will now have the opportunity to make its intentions clear.

In the meantime, courts must decide the cases that have already happened. Because I don't believe that Congress intended the result reached by the majority, I respectfully dissent. I will leave to others the task of rehashing the multiplicity of arguments advanced by the "numerous commentators", see majority op. note 11, who almost uniformly disagree with the result we reach today.[1] I write separately only to indicate another path to the contrary result.[2]

The result in this case cannot properly be determined merely by interpreting broadly the phrase "in connection with". There can be no quarrel with the majority opinion that the phrase is to be interpreted broadly, and that, if it is so interpreted, the expenses of issuing debt securities and

---

[1] I'm well aware that the result argued for by these commentators coincides for the most part with the financial interests of their clients and the corporations and firms they would welcome as clients.

[2] My only cavil with the persuasive majority opinion is its initial recourse to the dictionary (majority op. p. 352), which partially obscures the process of judicial reasoning by failing to tell us what informs the choice to do so. See Comment, "Looking It Up: Dictionaries and Statutory Interpretation", 107 Harv. L. Rev. 1437, 1453 (1994). The majority opinion states that "Events or elements are 'connected' when they are 'logically related'", citing Webster's Third New International Dictionary 480 (1986) (majority op. p. 352). It bears noting that the logical relationship referred to by the majority is not the logic of the laws of thought and correct syllogistic reasoning, but the "logic of events" that has to do with cause and effect relationships and necessary connections or outcomes. See Webster's New Universal Unabridged Dictionary 1064 (2d ed. 1979).

obtaining loans, which were necessary to effectuate the redemption, were, *at one remove in a chain of causation,* "in connection with" the redemption. But the question that the majority and other courts should face up to more forthrightly is whether that connection is not displaced or trumped by the *direct* cause and effect relationships between the expenses at issue and the debt securities and loans that financed the redemption. Because, under well-settled principles of tax law, those expenses must be amortized over the periods outstanding of the debt securities and loans to which they relate—and the interest on which is deductible under section 162(k)(2)(A)(i)—I would conclude that the amortization deductions for those expenses are not disallowed by section 162(k)(1).

HALPERN, *J.,* agrees with this dissent.